[Cite as *Orren v. BWF Corp.*, 2015-Ohio-62.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

|  |  |  |
|---|---|---|
| SHELLY ORREN, Administrator of the Estate of Amanda E. Poe, et al., | : | |
| | : | CASE NO.   CA2013-11-112 |
| Plaintiffs-Appellees, | : | O P I N I O N |
| | : | 1/12/2015 |
| - vs - | : | |
| | : | |
| BWF CORPORATION, et al., | : | |
| Defendants-Appellants. | : | |
| | : | |

CIVIL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 11CV80725

E.J. Leizerman & Associates, LLC, Michael J. Leizerman, Rena M. Leizerman, 717 Madison Avenue, Toledo, Ohio 43604, for plaintiffs-appellees,

John K. Benintendi, P.O. Box 145496, Cincinnati, Ohio 45250-5496, for defendant, BWF Corporation

Fruend, Freeze & Arnold, Christopher W. Carrigg, Lisa A. Hesse, Fifth Third Center, 1 South Main Street, Suite 1800, Dayton, Ohio 45402-2017, for defendant-appellant, John R. Jurgensen Co.

**PIPER, J.**

{¶ 1}   Defendant-appellant, John R. Jurgensen Co. (Jurgensen), appeals a judgment entered in the Warren County Court of Common Pleas in favor of plaintiff-appellee, Shelly

Orren as administrator of the estate of Amanda Poe.

{¶ 2}  Jurgensen is a heavy-road highway contractor that has been in business for approximately 75 years.  The company constructs highways, state routes, and county roads in Southwest Ohio, as well as certain areas of Indiana and Kentucky.  Jurgensen won a contract from the state of Ohio, through the Ohio Department of Transportation (ODOT), to widen a nine-mile stretch of Interstate 75, some of which was located in Warren County.

{¶ 3}  The job required Jurgensen to remove large quantities of dirt from the area being widened, and the work progressed north from the southern portion of the nine-mile stretch.  The dump truck drivers hired by Jurgensen would transport the dirt from the excavated areas to a dumping zone approximately one mile away.  The dump trucks would be filled with dirt while in the highway's median and then enter the highway's left-most lane, which is considered the "fast lane" of traffic, in order to travel south toward the dump site.  The north-bound return trip occurred with the dump truck driving in the median to return to the excavation site, never entering the highway.

{¶ 4}  Just after 9:00 p.m. on October 17, 2009, a dump truck driven by Timothy Smith was tasked with taking a load of dirt from the median to the dump site.  Once the truck was fully loaded, Smith waited on the median until he felt that he could safely enter the roadway.  Smith had traveled approximately 24 seconds and 574 feet in the highway's fast lane when he felt a strong impact from behind, as the rear of his truck was hit by a 2009 Nissan Maxima driven by Nicholas Poe.  Amanda Poe, Nicholas' wife, was a passenger in the front seat of the Maxima.  Nicholas and Amanda, neither of whom was wearing a seatbelt, died on impact.

{¶ 5}  The Ohio State Highway Patrol investigated the accident and took several photographs of the dump truck Smith was operating.  The investigation indicated that the truck's lights were working at the time of the accident, including brake lights, three rear

- 2 -

marker lights, and hazard lights that flashed. However, the photographs indicated that dirt obscured much of the back of the truck, including the license-plate area and reflective conspicuity tape that had been placed on the back of the truck. The investigation also indicated that several signs had been placed along the highway at various intervals before the accident location, warning of construction and trucks entering the highway. However, the last sign located on the left side of the road was located about two miles from the site of the accident. The investigation also revealed that Nicholas' speed immediately preceding the impact was 79 m.p.h., while the posted speed limit was 65 m.p.h.

{¶ 6} The mothers of Nicholas and Amanda brought suit as administrators of the estates of their respective children against several defendants, including Jurgensen and Timothy Smith. After some of the defendants were dismissed from the case, a six-day jury trial occurred with Smith and Jurgensen as the defendants. Jurgensen and Smith moved the trial court for a directed verdict at the end of the plaintiffs' case, as well as at the end of their own case. The trial court denied each motion for a directed verdict on both occasions. The jury then returned a verdict finding Nicholas 51 percent liable for the accident, Jurgensen 25 percent liable, and ODOT 24 percent liable although appellee had not requested recovery from ODOT. The jury did not find Smith liable. The jury awarded Amanda's estate $16 million in damages, $4 million of which was apportioned to Jurgensen.

{¶ 7} Jurgensen filed motions for judgment notwithstanding the verdict, a new trial for damages, and remittitur. The trial court denied each of Jurgensen's motions. Jurgensen now appeals the judgment entered against it and the trial court's decision denying the post-trial motions, raising the following assignments of error. Because Jurgensen's first and second assignments of error are interrelated, we will address them together.

{¶ 8} Assignment of Error No. 1:

{¶ 9} THE TRIAL COURT ERRED IN DENYING JURGENSEN'S MOTIONS FOR

DIRECTED VERDICT AND FOR JUDGMENT NOTWITHSTANDING THE VERDICT WHERE THERE WAS NO LEGALLY SUFFICIENT EVIDENCE TO PERMIT REASONABLE MINDS TO CONCLUDE THAT JURGENSEN'S NEGLIGENCE PROXIMATELY CAUSED THE DEATH OF AMANDA POE.

{¶ 10} Assignment of Error No. 2:

{¶ 11} THE TRIAL COURT ERRED IN DENYING JURGENSEN'S MOTIONS FOR DIRECTED VERDICT AND JUDGMENT NOTWITHSTANDING THE VERDICT WHERE REASONABLE MINDS COULD ONLY CONCLUDE, BASED UPON THE EVIDENCE PRESENTED AT TRIAL, THAT THE NEGLIGENCE/SPEED OF NICHOLAS POE WAS THE SOLE PROXIMATE CAUSE OF THE ACCIDENT AND AMANDA POE'S DEATH.

{¶ 12} Jurgensen argues in its first two assignments of error that the trial court erred in denying its motions for directed verdict and judgment notwithstanding the verdict because Nicholas' speeding was the proximate cause of the accident rather than any negligence attributable to itself.

{¶ 13} We review a trial court's decision on a motion for directed verdict or judgment notwithstanding the verdict de novo. *Phipps v. Internatl. Paper Co.*, 12th Dist. Clinton No. CA2013-02-003, 2013-Ohio-3994, ¶ 10. A favorable ruling on either motion is not easily obtained. *Osler v. Lorain*, 28 Ohio St.3d 345, 347 (1986). The standard for granting a motion for judgment notwithstanding the verdict is the same as that for granting a motion for directed verdict. *Choate v. Tranet, Inc.*, 12th Dist. Warren No. CA2005-09-105, 2006-Ohio-4565, ¶ 48.

{¶ 14} The standard for granting a directed verdict is set forth in Civ.R. 50(A)(4), which provides,

> When a motion for directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that

- 4 -

upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

{¶ 15} When considering either motion, the evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made. *Phipps* at ¶ 11. If the court finds that reasonable minds could not differ as to any determinative issue, then the court must sustain the motion. *Id.* If, on the other hand, there is substantial competent evidence to support the nonmoving party, upon which reasonable minds might reach different conclusions, the motion must be denied. *Id.*

{¶ 16} In order to establish a negligence claim, the plaintiff must demonstrate a duty owed by the defendant to the plaintiff, a breach of that duty, and that the plaintiff's injury proximately resulted from the defendant's breach of duty. *Johnston v. Filson*, 12th Dist. Clinton No. CA2014-04-007, 2014-Ohio-4758, ¶ 9, citing *Jeffers v. Olexo*, 43 Ohio St.3d 140, 142 (1989). The proximate cause of an event is generally thought of as "that which in a natural and continuous sequence, unbroken by any new, independent cause, produces that event and without which that event would not have occurred." *Morgan v. Ramby*, 12th Dist. Warren Nos. CA2010-10-095, CA2010-10-101, 2012-Ohio-763, ¶ 25, quoting *Wilson v. AC & S, Inc.*, 169 Ohio App.3d 720, 2006-Ohio-6704, ¶ 106 (12th Dist.). Proximate cause "contemplates a 'probable' or 'likely' result, not merely a 'possible' one," and therefore, the issue of proximate cause is not subject to speculation or conjecture. *Morgan* at ¶ 25.

{¶ 17} Jurgensen argues that the trial court should have granted a directed verdict or judgment notwithstanding the verdict because Nicholas' own negligence was the sole

proximate cause of the accident.[1] Its experts testified that Nicholas' speed of 79 m.p.h. was the cause of the accident, that it was possible that Nicholas was not paying attention to the road in front of him at the time of the accident, and that Nicholas failed to maintain an assured clear distance ahead.[2] The jury was presented with evidence and testimony to support the expert testimony of Jurgensen's witnesses on these points. However, the jury was also presented with evidence and testimony that conflicted, rebutted, or called into question some of the expert testimony presented by Jurgensen. None of the expert testimony established definitively what happened in the seconds before impact.

{¶ 18} We disagree with Jurgensen's arguments that Nicholas' own negligence was the sole proximate cause of the accident. The jury heard testimony and considered evidence of multiple breaches of duty that were a proximate cause of the accident. It is important to note that the jury did take into consideration Nicholas' speed and the impact that speed had on the accident and ultimate cause of death.[3] So, too, did the jury consider other contributing factors in the natural and continuous sequence occurring moments before the accident. In

---

1. We would also note that the jury heard testimony that Nicholas and Amanda failed to wear their seatbelts. However, the expert testimony indicated that death would have occurred even had seatbelts been worn.

2. Ohio's assured clear distance statute prohibits a driver from operating a vehicle at a speed greater than is reasonable to allow it to stop within an assured clear distance. R.C. 4511.21(A). A violation of the statute requires that the driver collided with an object that is ahead of him in his path of travel that was either stationary or traveling in the same direction as the driver, did not suddenly appear in the driver's path, and was reasonably discernable. *Zieger v. Burchwell*, 12th Dist. Clermont No. CA2009-11-077, 2010-Ohio-2174, ¶ 24. As discussed throughout the opinion, the jury heard ample evidence regarding whether the truck was discernable. By virtue of its verdict finding that Nicholas was 51 percent liable, the jury could have found that Nicholas violated the assured clear distance statute to some degree. However, there were no interrogatories asking the jury to explain its reason for finding Nicholas liable, so that we are unaware of the jury's basis for his liability.

3. While multiple experts agreed, including one of Orren's, that Nicholas was traveling at approximately 79 m.p.h. at the time of the accident, the jury heard some evidence that Nicholas may have been traveling closer to 67 m.p.h. The jury was in the best position to weigh the credibility and impact of the conflicting evidence, and its finding that Nicholas was 51 percent liable demonstrates that the jury considered all factors specific to Nicholas' driving, including his speed, whether he was paying close attention to the road, and whether he could have done something to avoid the accident.

so considering, the jury apportioned 51 percent of the liability to Nicholas, finding his level of negligence twice as much as Jurgensen's.[4]

{¶ 19} However, the finding that Nicholas was 51 percent liable did not foreclose the jury's ability to find that Jurgensen breached duties and that the breach was also the proximate cause of the accident. For example, the jury heard evidence that the accident would have occurred, even absent Nicholas' speeding. Dr. Dennis Guenther, a registered mechanical engineer, appeared as an expert for Jurgensen, and testified that the accident was caused by Nicholas' speed. However, Dr. Guenter also testified that had Nicholas been traveling at 65 m.p.h., the accident would still have occurred. Moreover, the evidence offered was competent and credible that Jurgensen could have taken several different steps to avoid or lessen the likelihood of the hazard that caused Amanda's death, regardless of the manner in which Nicholas was driving.

{¶ 20} During Orren's case-in-chief, the jury heard testimony from Trooper Brandon Ruhl of the Ohio State Highway Patrol, who was assigned as lead investigator of the accident. Trooper Ruhl's investigation included taking photographs of the truck and reporting the overall condition of the truck on the night of the accident. Regarding the condition of the truck, Trooper Ruhl testified that reflective tape on the truck was "old," that parts of the reflective tape were "missing," and that dirt or dried mud was covering the rear of the truck. While the reflective tape was meant to help make the truck more discernable at night, Trooper Ruhl testified that he could not see the reflective tape from 1000 feet away. Trooper Ruhl also testified that the lights on the back of the truck were "dirty." Exhibits introduced into evidence supported Trooper Ruhl's testimony.

---

4. Jurgensen attempts to invoke the doctrine of res ipsa loquitor because of its perception of the evidence as it unfolded and the jury's ultimate decisions. However, the significance of the doctrine's application is misplaced. No jury instruction was given regarding res ipsa loquitor and no argument or mention of res ipsa loquitor occurred during the trial.

{¶ 21} Sergeant Charles Scales of the Ohio State Highway Patrol, the Southwest Ohio Crash Reconstruction Supervisor, also investigated the accident. Sergeant Scales testified that the back of the truck was dirty, that he believed the truck's reflectors and lenses were "obscured," and that there was "diminished reflectivity of the lens." Sergeant Scales testified that the truck had diminished reflectivity due to the dirt, and that he cleaned a portion of the conspicuity tape to show the difference between the dirty portion and the clean portion. Sergeant Scales took a photograph after he cleaned part of the reflective tape, and the jury was able to see the difference between the muddied portion of the tape, as compared to its reflective abilities once it was cleaned.

{¶ 22} The testimony of Trooper Ruhl and Sergeant Scales permitted the jury to determine that the condition of the truck was such that the dirty reflective tape and dirty lights made the truck less discernable than it would have been had the tape and lights been more visible. This is especially true where the jury heard testimony from James Crawford, an accident reconstructionist and engineer, that in his opinion, the truck was "filthy," and that the dirty lights and reflective surfaces would have made it more difficult for Nicholas to accurately perceive the truck. "The vehicle would have to get closer to [the truck] in order for it to perceive the brightness of these things for what they actually are. If they're dimmer because of dirt, then it's a lot easier to be mistaken for a light that is farther off in the distance or maybe some other light that's part of the construction area that is around."

{¶ 23} Crawford also testified that the diminished effectiveness of the lights was compounded by the fact that there was "light clutter" around the construction site. Crawford explained that light clutter occurs when there are various lights in the background, and other, more prominent, lights can be mistaken for the same lights that appear in the background. When asked what impact the truck's dirty lights would have had, Crawford explained, "as a driver, we're expecting to see taillights on a vehicle and it will be a certain brightness and

when you see taillights that's a certain brightness and then you see some other lights that are a lot dimmer than that, it's very easy to mistake those for something other than what they are." Crawford further explained, "if what the driver is doing as he's looking at some relatively dim taillights, the relatively dim taillights could look as though they're father off than they actually are and could be easily confused for something in the distance such as another one of these points of light in the light clutter."

{¶ 24} Jurgensen presented the expert testimony of James Sobek, a senior accident analysis who is an expert in conspicuity, which is the "convenience of being conspicuous." Sobek testified that in his estimation, the truck's lights would have been visible from 2000 feet, but that he did not test the lights with dirt on them because he did not know how much dirt was on the truck on the night of the accident.[5] While Sobek took into consideration the dirty nature of the lights when making his calculations, he admitted that the photographs he took of the truck to use in his investigation were not a good representation of the truck on the night of the accident or what Nicholas would have seen on the road that night because the truck was clean and not placed in the proper context of the construction site at night.

{¶ 25} During cross-examination, Sobek was asked several questions regarding the truck's condition on the night of the accident, including the dirt that obstructed the reflective tape and lights. Sobek confirmed that in its condition on the night of the accident, the reflective tape did not meet federal standards for the use of such tape because of the worn and dirty appearance of the tape, and that the conspicuity of the truck would have increased had the dirt been wiped from it before it entered the highway.

---

5. During Sobek's testimony, he explained the difference between visibility and discernibility. He testified that to be discernible, the object has to be visible and understood to be what the object actually is. So, for example and pertinent to the case at bar, in order for the truck to be discernible, it would have to have been visible to Nicholas and Nicholas would have needed to understand that it was a dump truck. While it may be possible that Nicholas saw lights ahead, he would have needed to understand the proximity of the hazard attached to those lights and that it was a slow-moving truck driving in the fast lane in order to appreciate the dangers he needed to avoid.

{¶ 26} Despite the importance of the need for the reflective tape and lights to operate effectively, the jury heard evidence that Jurgensen did not take any steps to ensure that the discernibility devices were clean and functioning effectively as they were meant to before the truck traveled into the fast lane of I-75. Timothy Smith testified that Jurgensen did not permit him to get out of his vehicle once he had started work in order to clean the dirt from the back of the truck. While the jury heard testimony from Jurgensen foreman John Singer that he kept Windex and rags on site for the purpose of wiping down trucks, Smith testified that no one from Jurgensen wiped down the dirt or permitted him to clean his truck once the job had started. Smith testified, however, that had he been permitted, he would have wiped off the accumulated dirt from his truck. As such, the jury heard and saw evidence that the truck's condition made it less discernable to Nicholas before the accident occurred.

{¶ 27} The jury also heard evidence regarding several ways in which Jurgensen could have made the situation more safe, such as (1) using law enforcement vehicles with operating lights to alert traffic, (2) having more and better placed signage warning approaching vehicles, (3) using the median for the trucks to travel in, and (4) the use of high-intensity lights on trucks to aid in identifying their presence. While we appreciate the fact that Jurgensen was limited by what ODOT permitted it to do in regard to traffic modifications, such as closing lanes and lowering the speed limit, the jury heard ample testimony that Jurgensen was authorized and had the means to take several steps to limit or minimize the hazards associated with the dump trucks entering form a dead stop directly into the fast lane of I-75.

{¶ 28} Orren presented evidence regarding the hazardous situation and the availability of possible actions to increase safety, much of which was elicited from Jurgensen's own employees. Jason Mudd, a Jurgensen employee, was the Project Manager for the I-75 widening job, and was in charge of scheduling, ordering materials, completion of the job, and

obtaining payment for services rendered. Mudd testified that Jurgensen was aware that the area of I-75 that they were widening was a high-traffic interstate, with approximately 100,000 drivers traveling that portion of the highway on a daily basis. Mudd testified that Jurgensen asked ODOT to lower the speed limit in that area from 65 to 55 in order to insure safety of Jurgensen workers and the public drivers, but that ODOT refused the request. While ODOT refused the request, the fact that Jurgensen asked for the speed limit to be lowered indicates its awareness that certain hazards were present in regard to the work being done. In fact, and specific to the accident that eventually occurred, Mudd confirmed that there is potential danger to entering the fast lane from a stopped position, that the danger increased at night, and that the danger could be decreased or eliminated through various safety measures.

{¶ 29} Sergeant Clint Arnold of the Ohio State Highway Patrol testified that he is Trooper Ruhl's supervisor and that he approved Trooper's Ruhl's investigation of the accident. Sergeant Arnold testified that after reviewing Trooper Ruhl's report and seeing the truck for himself, he considered ways to make the area safer for those driving on I-75 where the widening was occurring. Sergeant Arnold suggested having law enforcement present when trucks were coming in and out of the median area, using flairs, arrow boards, lane closures, using an acceleration lane, and lowering the speed limit. Again, and while ODOT refused to close a lane or lower the speed limit, the jury heard evidence that Jurgensen could have employed other safety measures that were solely within its power to employ.[6]

**Use of Law Enforcement**

{¶ 30} Regarding the use of law enforcement vehicles, multiple witnesses testified that Jurgensen could have hired law enforcement officers to position their cruisers near the point where dump trucks were entering the highway in order to temporarily block the fast lane. The

---

6. While ODOT was not a party to the case, the jury found it 24 percent liable, likely based on its refusal to permit increased safety measures such as lane closures or reduced speed limits.

testimony indicated that the police officer would pull his cruiser with flashing lights into the fast lane when the truck was ready to enter, and stay until the truck was a safe distance ahead before pulling back onto the median. The presence of law enforcement vehicles operating in this way would have redirected traffic while simultaneously slowing it down.

{¶ 31} The use of law enforcement would have circumvented the refusal of ODOT to permanently shut down the lane, but at the same time, provide the trucks with a "closed" acceleration lane. According to Mudd, Jurgensen designated over two million dollars of the project's budget for maintenance of traffic, including $300,000 for use of law enforcement officers. Though Jurgensen had the authority and budget to use law enforcement officers to create a defacto acceleration lane/temporary lane closure, no law enforcement officers were used on the night of the accident.

**Signage**

{¶ 32} The jury also heard extensive testimony regarding the signage used to designate the construction area, and considered evidence that the signage was not adequate to warn of the hazard. During Mudd's testimony, he confirmed the fact that Jurgensen had been told by ODOT that the signs indicating that trucks were entering the highway and that drivers needed to watch for slowed traffic were needed on both sides of the roadway, and that Jurgensen received an email from ODOT asking them to make sure that they had the proper signage in that regard. The testimony and evidence revealed, however, that Jurgensen had not placed signage on both sides of the road at regular intervals, and that the last sign Nicholas would have passed warning he was approaching a hazard was 1.6 miles away from the accident site. The last sign Nicholas passed that was located on the left side of the road, closest to where the trucks were actually entering, was two miles away from the accident site. None of the signage used indicated that construction was occurring at night, and no signs indicated that trucks were entering or exiting the highway within 2.5 miles of the

accident site. One sign, located approximately 3.7 miles back from the accident site, indicated that trucks were entering the highway within 1,000 feet. However, there was no sign 1,000 feet away from the excavation site where Smith actually entered I-75 indicating that trucks would be entering the highway at that point.

{¶ 33} While Jurgensen relies upon the fact that there were some signs posted indicating the presence of the construction zone and that trucks would be entering the highway, the jury heard ample testimony that the signs were not positioned appropriately. The jury also heard testimony that the signs were not specific enough to indicate the exact stretch of the highway where drivers could expect to encounter slow moving trucks entering and exiting. For example, a digital sign warning of entering trucks was located on the right-hand side of the road, rather than on the left where the trucks were actually entering the highway.[7]

{¶ 34} Orren called Daniel Mendal, a transportation engineer with ODOT, who testified that ODOT stayed in contact with Jurgensen throughout the widening project regarding safety and signage. Mendal testified that a warning sign should be placed approximately 1,300 feet before the entrance point where trucks were entering the highway in order to warn drivers that trucks were entering from the median. When asked the importance of the 1,300 foot sign, Mendal responded,

> because you want to give the motorist advance notice that a vehicle is going to be slowing up to get out of traffic into that work zone or speeding up to get into the work zone, so you want to give them advance notice. Now it's one of those things you don't

---

7. Michael Thompson, a civil engineer and former ODOT employee, testified that digital signs such as the one active on the night of the accident are usually placed on the side of the road where they can be protected from motorists hitting them. Thompson testified that the signs are "very expensive" and need to be guarded for that reason. However, Thompson also testified that in the event that no guardrails are present on a particular side of the highway, construction companies could put barrels around the sign to protect them from being hit. Even so, Jurgensen chose to place the digital sign on the right side of the road, farthest from the lane being used for truck entry.

want to give it to them like two miles ahead or five miles ahead because by the time they got up there they've forgotten, so there's a distance that you want to put it in so that it gives them enough notice to be aware but not too much where they forget.

Mendal also testified that the signage should be placed on "whatever side they're entering and exiting" so that the driver understands on what portion of the highway the trucks will enter.

{¶ 35} The signs posted by Jurgensen had the effect of warning that construction was occurring for the whole nine-mile stretch, rather than indicating the specific hazards of the dump trucks' ingress and egress into the fast lane of I-75. At the least, Jurgensen could have placed a sign 1,000 or 1,300 feet before the entrance site, indicating that the driver should be aware that within the next 1,000/1,300 feet, a dump truck could be entering the highway. Or, Jurgensen could have concentrated the digital and other signage on the left-hand side of the road where drivers would be presented with, and need to identify, the slow moving dump trucks. The placement of these signs was within Jurgensen's control, and it did not need ODOT's approval for placement of the signs.

**Use of Median**

{¶ 36} The jury also heard testimony that Jurgensen could have avoided the trucks driving on the highway altogether by having them drive both ways within the median. The evidence indicated that the trucks returning from the dump site, heading north, traveled in the median, while the fully-loaded trucks traveled on the highway toward the dump site. During Mudd's testimony, he confirmed that the median area was approximately 63-66 feet wide, which was "more then [sic] enough room to physically fit trucks going northbound and southbound." William Jackman, an accident reconstructionalist and civil engineer, testified that in his opinion, the trucks could have been traveling both north and southbound on the median, and that he did not see any "major obstacles that they had to contend with * * *."

{¶ 37} Smith also testified that as a Jurgensen dump truck driver, he used a portion of the median to travel back toward the dirt pile once he had dumped his load. He described driving the mile back toward the dirt pile and stated that the truck would be "wiggling around some things" such as other trucks or construction vehicles. When asked whether or not the truck could use the median to travel toward the dump site, Smith responded that the only thing to take into consideration would be other trucks and the construction going on in the area. These same concerns were present in the trip from the dump site back to the dirt pile, yet Jurgensen employed the median for the trip north, but chose not to use the median for the south-bound trip.[8] Again, Jurgensen could have employed this safety measure on its own, with no involvement from ODOT.

**High-Intensity Lights**

{¶ 38} The jury also heard extensive evidence regarding the use of high-intensity lights, and the impact such lights would have had on the truck's discernibility. High-intensity lights, or the yellow/amber lights located on top of a truck that strobe, rotate, or oscillate, are required by the Ohio Manual of Uniform Traffic Control Devices (OMUTCD) when work is being performed outside of the shoulder.[9] As explained by Jackman during his testimony, high intensity lights would have been very beneficial to the other drivers on the road that night because such lights

> can be seen much farther, it's flashing in a rather unique manner
> so it's calling attention to itself, it's [sic] brightness and it's [sic]
> action is attracting the attention of approaching driver's [sic],

8. John Singer, a foreman on the widening project, testified that trucks were not driven against traffic because drivers on I-75 may have been startled to see dump truck headlights coming in their direction, even though the trucks would have been safely within the median section. Singer also testified that the construction project involved boring pits in the median in order to install necessary pipework. Even so, no witness testified that making the south-bound trip in the median was impossible.

9. The requirement that high-intensity lights be used is further discussed in Jurgensen's fourth assignment of error specific to whether the trial court properly found that Jurgensen was negligent per se for its failure to use high-intensity lights.

> which is what we're trying to do, we're trying to alert them to something, and with that guidance expect them to make the appropriate, take the appropriate action, whatever it might be.

The brightness and strobing and/or oscillating nature of high-intensity lights are remarkable in regard to construction that occurs at night, which requires precautions because of decreased visibility associated with nighttime driving and increased speed of travel due to a lower volume of traffic. Conspicuity expert James Sobek agreed that the use of high-intensity lights on the truck would have made it more conspicuous.

{¶ 39} While Jurgensen argues that the truck's lights were working, and that its hazard lights were flashing, the OMUTCD specifically provides that hazard lights cannot be used in place of high-intensity lights. The jury heard testimony from Kenneth Bolser, a worksite supervisor with Jurgensen, regarding the OMUTCD's standard that high-intensity lights be used. When asked why Jurgensen did not use high intensity lights on its trucks, Bolser responded, "I have no idea." The jury also heard Mudd testify that he agreed that the use of high-intensity lights could have possibly minimized the risks presented by trucks entering into the fast lane from a complete stop. As such, the jury heard from Jurgensen employees that Jurgensen understood the benefit of high-intensity lights, and that such lights were addressed in the OMUTCD, but that Jurgensen failed to employ the lights to help minimize the risks involved.

{¶ 40} The use of high-intensity lights was within Jurgensen's sole control, and was not dependent upon ODOT in any way. While Jurgensen argues that the industry standard was to use hazard lights instead of high-intensity lights, the OMUTCD expressly provides that hazard lights should not be used in lieu of high-intensity lights. However, and even if the OMUTCD were not in effect or did not require the use of high-intensity lights, Jurgensen could have employed the lights on its own authority to make the trucks more discernable and the hazard of entering trucks more cognizable. Indeed, and according to Jackman, the

"easiest thing" to increase safety during nighttime construction would have been for Jurgensen to employ the high-intensity lights, especially given the lack of other precautions provided for the south-bound side of the highway.

**Proximate Cause Summary**

{¶ 41} The jury heard evidence that the north-bound side of the highway was situated differently than the south-bound side. The north side contained barrels, cones, and portable concrete barriers, none of which were used on the south side. These extra precautions were used on the north side of the road even though the trucks were not making use of the highway to return from the dump site to the excavation site/dirt pile. When asked whether Jurgensen could have made better use of the safer north-bound side of the highway by having the trucks enter on that side, Mudd testified that the trucks would have had to turn around someplace in the median in order to be headed in the right direction. The jury could reasonably question the rationale for protecting the northbound lanes, instead of the southbound lanes, when trucks did not enter I-75 on the north side. The jury could also question the judgment not to turn the trucks around in the median that was over 60 feet wide, and weigh the inconvenience of such a turn-around against the dangers inherent in entering the high-speed lane from a dead stop.

{¶ 42} The jury had before it ample evidence specific to the ways that Jurgensen could have made the area safer, and how it could have minimized the risks of having their trucks enter the fast-lane from a stop. The jury heard evidence that Jurgensen did not address the truck's dirty condition and obstructed lights, and further compounded the issue by using hazard lights instead of high-intensity lights. The jury considered the lack of adequate and well-placed signage to further limit the risks, as well as steps Jurgensen could have taken to eliminate the risk altogether such as driving exclusively in the median or using law enforcement to create a temporary acceleration lane for the trucks.

{¶ 43} Jurgensen argues that none of these issues serve as a proximate cause for the accident when their experts testified that Nicholas' speed was *the* proximate cause. However, and as previously discussed, the jury did in fact consider and attribute negligence to Nicholas because of his actions or his lack of action immediately preceding the accident. The jury's verdict shows sophistication and thorough consideration of the facts and evidence. After our own thorough consideration of the facts and evidence, we find that the trial court properly denied Jurgensen's motions for a directed verdict and judgment notwithstanding the verdict where reasonable minds could, and did, come to a conclusion that Nicholas' speed was not the only proximate cause of the accident and that Jurgensen's breach of duty/duties caused the Poes' accident. As such, and after considering all of Jurgensen's arguments, we overrule its first and second assignments of error.

{¶ 44} Assignment of Error No. 3:

{¶ 45} THE TRIAL COURT NOT ONLY ERRED IN DENYING JURGENSEN'S MOTION FOR REMITTITUR/NEW TRIAL AS TO DAMAGES, BUT ALSO ABUSED ITS DISCRETION TO JURGENSEN'S PREJUDICE BY ENCOURAGING THE JURY TO AWARD DUPLICATIVE AND EXCESSIVE NON-ECONOMIC DAMAGES THROUGH ITS SUBMISSION OF LEGALLY IMPROPER INTERROGATORIES TO THE JURY.

{¶ 46} Jurgensen argues in its third assignment of error that the trial court erred in denying its alternative motions for either remittitur or a new trial on damages, as well as by giving the jury an improper interrogatory regarding damages suffered by Amanda's estate.

{¶ 47} "When a trial court considers a verdict to be so excessive as to have been rendered under the influence of passion or prejudice, the verdict should be set aside and a new trial granted." *Cox v. Oliver Mach. Co.*, 41 Ohio App.3d 28, 35 (12th Dist.1987). In determining if the jury's verdict was excessive, the size of the verdict, per se, will not suffice as proof of passion or prejudice. *Clay v. Baltimore & Ohio R. Co.*, 12th Dist. Warren No.

CA85-09-057, 1986 WL 14079, *2 (Dec. 8, 1986). "Rather, in order to constitute passion or prejudice, it must appear that the jury's assessment of the damages was so overwhelmingly disproportionate as to shock reasonable sensibilities." *Id.* A mere disagreement by the court with the amount of the jury's award will not justify setting the verdict aside. *Id.*

{¶ 48} This court reviews a trial court's decision regarding granting a new trial or remittitur for an abuse of discretion. *Harris v. Mt. Sinai Med. Ctr.*, 116 Ohio St.3d 139, 144, 2007-Ohio-5587, ¶ 35. An abuse of discretion is more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Id.*

{¶ 49} After reviewing the record, we find no abuse of discretion in the trial court's denial of Jurgensen's motions for a new trial on damages or remittitur. Jurgensen has not pointed to any indication in the record that the jury was under the influence of passion or prejudice when it rendered its verdict, and this court has not found any such indication after a thorough review of the record.

{¶ 50} Nor is there any indication in the record that the damages awarded were so overwhelmingly disproportionate as to shock reasonable sensibilities. Instead, the jury heard testimony from Orren regarding the loss of her daughter and the impact such a loss has had on her and the family. Orren testified to the shock of learning that her daughter had died, the painful days that followed the accident in regard to making final arrangements for Amanda, as well as the on-going pain she feels due to the loss of her daughter. Orren testified to having a close relationship with Amanda, the excitement she once felt at the prospect of becoming a grandmother to Amanda's future children, and the devastation of Amanda's absence.

{¶ 51} It is impossible for this, or any, court to place a value on the pain one feels because of the loss of a loved one. It is impossible to establish a specific monetary threshold to judge jury verdicts against when the award is based upon mental anguish, loss of love,

society, and companionship. Instead, Ohio law provides that such awards cannot be changed unless the award is excessive or was rendered under the influence of passion or prejudice. Because there is no indication that the jury's verdict and award of damages was excessive or predicated upon prejudice or passion, we will disturb neither the jury's decision nor the trial court's decision to overrule the motions for a new trial on damages or remittitur.

{¶ 52} Jurgensen also argues that the jury's award was erroneous because the trial court gave the jury an improper interrogatory. Included with the trial court's final jury instructions and verdict forms, the trial court gave the jury Interrogatory 10, which asked the jury to determine an amount to "fairly and fully compensate the Estate of Amanda Poe for the harms and losses resulting from the death of Amanda Poe." Within the interrogatory, the jury was asked to determine an amount to compensate "the mental anguish already experienced," "the mental anguish to be experienced in the future," "loss of love, society, companionship, attention, care and guidance since Amanda Poe's death," and "loss of love, society, companionship, attention, care and guidance in the future." Jurgensen argues that this interrogatory improperly permitted the jury to award damages for future harm, which it asserts is unpermitted by Ohio's wrongful death statute.

{¶ 53} According to R.C. 2125.02(A)(1), a parent who has lost a child and brings a wrongful death suit is "rebuttably presumed to have suffered damages by reason of the wrongful death, and for the exclusive benefit of the other next of kin of the decedent." The statute provides that a jury may award damages "as it determines are proportioned to the injury and loss resulting to the beneficiaries * * *." R.C. 2125.02(A)(2).

{¶ 54} R.C. 2125.02(A)(3)(b)(i) provides, "in determining the amount of damages to be awarded, the jury or court may consider all factors existing at the time of the decedent's death that are relevant to a determination of the damages suffered by reason of the wrongful death." R.C. 2125.02(B), sets forth the basis for recovery, and provides, in pertinent part,

(B) Compensatory damages may be awarded in a civil action for wrongful death and may include damages for the following:

(3) Loss of the society of the decedent, including loss of companionship, consortium, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education, suffered by the surviving spouse, dependent children, parents, or next of kin of the decedent;

(5) The mental anguish incurred by the surviving spouse, dependent children, parents, or next of kin of the decedent.

{¶ 55} Jurgensen argues that Interrogatory 10 was impermissible because it broke down the mental anguish and loss of love and other factors into categories to compensate for both past mental anguish/loss of love and future mental anguish/loss of love. While we agree with Jurgensen that Ohio's Wrongful Death statute does not expressly divide the possible compensatory damages into past and future categories, we also agree with Orren that the statute does not prohibit such a consideration of past and future damages.

{¶ 56} As recognized by the Ohio Supreme Court, "money is a poor substitute for the damages" a parent suffers when a child has been harmed. *Gallimore v. Children's Hosp. Med. Ctr.*, 67 Ohio St.3d 244, 252 (1993). This is especially true because the "parent-child relationship is unique, and it is particularly deserving of special recognition in the law" where in our society, the parent-child relationship invokes "strong feelings of love and affection." *Id.* at 252.

{¶ 57} For these reasons, the Ohio Legislature expressly provided for a parent's right to recover for the wrongful death of a child. R.C. 2125.02(A)(1). Ohio's Wrongful Death statute is remedial in nature, and thus, should be read liberally to provide compensation for the wrongful death of a parent's child. *Burton v. DePew*, 47 Ohio App.3d 107, 109, (12th Dist.1988). *See also* R.C. 1.11 (providing that "remedial laws and all proceedings under them shall be liberally construed in order to promote their object and assist the parties in obtaining justice").

{¶ 58} While it is true that the statute uses past-tense words "suffered" or "incurred" to refer to the basis for recovery of damages, we do not believe the Ohio Legislature limited a parent's compensation for loss of love and mental anguish to that which was only experienced in the past. If we were to adopt Jurgensen's interpretation of the statute, a parent's recovery would be limited, without any viable reason, to the time between the date of the child's death to the date of the jury's verdict. Such would be an unreasonable application of a statute meant to compensate a parent for a child's wrongful death where a parent's loss and anguish does not have a definitive end date.

{¶ 59} As previously stated, nothing within R.C. 2125.02 limits recovery to only anguish or loss of love between the date of death to the date of the jury's verdict. Instead, a reasonable reading of the statute permits the recovery for a parent's mental anguish already experienced as well as the mental anguish that will continue past the date of a jury's verdict. Similarly, the statute's inclusion of a basis of recovery for loss of the society of the decedent, including loss of companionship, consortium, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, and education would permit recovery for those losses already experienced, as well as the continued loss naturally occurring into the future.

{¶ 60} By expressly providing for recovery for these profound losses, the Ohio Legislature did not inherently or overtly limit recovery to only past loss and anguish. The use of past-tense words "incurred" and "suffered" does not limit the recovery. Once incurred and suffered, the pain and loss associated with the death of a child does not stop being incurred; it continues in perpetuity. We will not limit the ability of a parent to recover for these losses, whether they be past, present, or future, where the statute does not expressly require such an interpretation.

{¶ 61} Having found that Interrogatory 10 and the trial court's ruling on Jurgensen's motions for a new trial on damages or remittitur were proper, Jurgensen's third assignment of

error is overruled.

{¶ 62} Assignment of Error No. 4:

{¶ 63} THE TRIAL COURT ABUSED ITS DISCRETION TO THE PREJUDICE OF JURGENSEN THROUGH ITS NUMEROUS ERRORS IN NOT ONLY REFUSING TO PERMIT COMPETENT PROBATIVE EVIDENCE WHICH WOULD PRECLUDE A FINDING OF NEGLIGENCE PER SE, BUT ALSO BY ENCOURAGING JURY SPECULATION THROUGH ADMISSION OF PREJUDICIAL, NON-PROBATIVE EVIDENCE INCLUDING HEARSAY AND SUBSEQUENT REMEDIAL MEASURES.

{¶ 64} Jurgensen argues in its fourth assignment of error that the trial court erred at several points during the trial, including its determination that Jurgensen was negligent per se, permitting hearsay testimony, and allowing testimony on subsequent remedial measures it employed after the accident. Jurgensen also alleges that the culmination of these errors, even if harmless on their own, resulted in an unfair trial.

**Negligence Per Se**

{¶ 65} Regarding negligence per se, Jurgensen argues that the trial court improperly determined that it had a duty and breached that duty based on a violation of Ohio law.

{¶ 66} Throughout discovery, and before the trial ever started, the parties argued the application of the Ohio Manual of Uniform Traffic Control Devices (OMUTCD) and what impact the OMUTCD had on establishing Jurgensen's negligence. The trial court determined that the rules set forth in the OMUTCD had the force of law, and that Jurgensen's failure to abide by those rules established that it breached a duty to require high-intensity rotating, flashing, oscillating or strobe lights on the dump truck. Jurgensen raised several objections to the trial court's finding of negligence per se, each of which was overruled by the trial court. The trial court then instructed the jury that both Jurgensen and Timothy Smith were negligent per se for their violations of the OMUTCD specific to not having high-intensity lights on the

dump truck.

**{¶ 67}** A violation of the statute that sets forth specific duties constitutes negligence per se. *Swader v. Paramount Property Mgt.*, 12th Dist. Butler No. CA2011-05-084, 2012-Ohio-1477, ¶ 22. However, negligence per se does not equate to liability per se, as negligence per se does not dispense with a plaintiff's obligation to prove that the defendant's breach was the proximate cause of the injury complained of. *Johnston v. Filson*, 12th Dist. Clinton No. CA2014-04-007, 2014-Ohio-4758, ¶ 10.

**{¶ 68}** Normally, a violation of administrative rules does not constitute negligence per se. *Chambers v. St. Mary's School*, 82 Ohio St.3d 563 (1998). However, and as specific to the case at bar, the Ohio Legislature adopted the OMUTCD by promulgating R.C. 4511.09, which required ODOT to adopt "a manual for a uniform system of traffic control devices * * *." R.C. 4511.11 further establishes a duty to act in conformity with the OMUTCD's specifications so that the OMUTCD comprises a section of Ohio law regarding traffic control devices. *Woods v. City of Beavercreek*, 62 Ohio App.3d 468 (2d Dist.1989). A violation of the OMUTCD can therefore provide the basis for a finding of negligence per se. *Nevins v. Ohio Dept. of Transp.*, 132 Ohio App.3d 6 (10th Dist.1998).

**{¶ 69}** The OMUTCD addresses the need for high-intensity lights within multiple sections. As discussed at trial, and offered through Orren's Exhibit 99 and 100, Figure 6H-1: Typical Application 1 Work Beyond the Shoulder and Section 6G.06: Work Outside of Shoulder discuss the use of high-intensity lights.

**{¶ 70}** According to Section 6G.06,

> When work is being performed off the roadway (beyond the shoulders, but within the right-of-way), little or no [Temporary Traffic Control] might be needed. TTC generally is not needed where work is confined to an area 4.6 m (15 ft) or more from the edge of the traveled way. However, TTC is appropriate where distracting situations exist, such as vehicles parked on the shoulder, vehicles accessing the work site via the highway, and

equipment traveling on or crossing the roadway to perform the work operations (for example, mowing). For work beyond the shoulder, see Figure 6H-1.

{¶ 71} Section 6G.06 goes on to provide "*Guidance*" that "*if the equipment travels on the roadway, the equipment should be equipped with appropriate flags, high-intensity rotating, flashing, oscillating, or strobe lights, and/or a SLOW MOVING VEHICLE sign.*" (Emphasis sic.)

{¶ 72} According to Figure 6H-1, which is implicated when there is work beyond the shoulder, an "Option" available for temporary traffic control is that "vehicle hazard warning signals may be used to supplement high-intensity rotating, flashing, oscillating, or strobe lights." The "Standard" within that same section further provides, "**vehicle hazard warning signals shall not be used instead of the vehicle's high-intensity rotating, flashing, oscillating, or strobe lights**." (Bold sic.)

{¶ 73} While Jurgensen argues that the use of the word "should" within Section 6G.06 indicates that the use of high-intensity lights was discretionary rather than mandatory, we find that Jurgensen was required by the OMUTCD to use high-intensity lights when operating the dump trucks. The Standard set forth in Figure 6H-1 expressly provides that the hazard warning signals "shall" not be used instead of high-intensity lights. This Standard, therefore makes the use of the high-intensity lights mandatory, rather than discretionary. The use of the word "should" within the guidance provision of Section 6G.06 does not vitiate the mandatory nature of the Standard set forth in Figure 6H-1.

{¶ 74} Moreover, and even if we were to agree with Jurgensen that the language was discretionary, Jurgensen agreed by contracting with ODOT to follow the specifications set forth in the OMUTCD when completing the job, including the "guidance" within Section 6G.06 that any equipment performing work outside of the shoulder should have high-intensity lights. During Mudd's testimony, he recognized that the OMUTCD called for the use of high-intensity

lights, and recognized that such use was required by the Standard in Figure 6H-1 in regard to using high-intensity lights instead of hazard lights.

{¶ 75} The record is clear that Jurgensen did not use high-intensity lights as required by the OMUTCD, and instead, employed only the dump truck's flashing hazard lights. The trial court, therefore, correctly determined that Jurgensen was negligent per se. However, and as discussed above, negligence per se establishes only that a duty exists and that the defendant breached that duty. Orren still had the burden to prove that the failure to use the high-intensity lights was the proximate cause of the accident.[10]

{¶ 76} The jury's verdict indicated that Jurgensen was 25 percent liable for the accident, but there is no indication that the liability was based solely on the lack of high-intensity lights.[11] Therefore, even if this court were to find that negligence per se were not applicable, the jury could still have found Jurgensen liable given the traditional negligence standard. As discussed within Jurgensen's first and second assignments of error, there were multiple duties that were breached by Jurgensen that constituted the proximate cause of the accident. As such, and even if the trial court did not make a finding of negligence per se, the

---

10. There is a reasonable inference, based on the jury's verdict finding that Smith was not liable, that the jury did not find that Jurgensen's violation of the OMUTCD was the proximate cause of the accident. While the trial court found both Smith and Jurgensen negligent per se for their respective failure to employ high-intensity lights, the jury did not find Smith liable; thereby indicating that the lack of high-intensity lights was not the sole proximate cause of the accident.

11. Jurgensen argues that it should have been afforded the opportunity to introduce expert testimony that the industry standard was not to use high-intensity lights, that ODOT did not enforce the standard, and that the OMUTCD was subject to interpretation. While the trial court did not permit Jurgensen to call a witness specifically to address the industry standard versus what was required by the OMUTCD, the jury did hear testimony from witnesses regarding the common use of hazard lights and flashers rather than high-intensity lights. For example, Michael Thompson, a civil engineer and former ODOT employee, testified that in his 40 years of experience, trucks used "their headlights, taillights and four way flashers" in a construction zone and when on the highway, and that the use of such lights was "standard practice * * * in the industry for dump trucks hauling material on a high speed lane." The jury, therefore, did hear evidence that the industry standard and common practice was to use headlights, taillights, and four way flashers. Even so, and as standard and common as that procedure may have been among construction companies, such universal noncompliance did not make the violation of OMUTCD procedures any more or less excusable.

jury had before it evidence that Jurgensen's actions were the proximate cause of Amanda's death and no error occurred in the trial court's ruling regarding the negligence per se issue.

## Subsequent Remedial Measures

{¶ 77} Jurgensen also challenges the admission of testimony regarding subsequent remedial measures specific to its use of high-intensity lights on dump trucks four days after the accident occurred.

{¶ 78} The decision whether to admit or exclude evidence is left to the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *Nguyen v. Chen*, 12th Dist. Butler No. CA2013-10-191, 2014-Ohio-5188, ¶ 41. According to Evid.R. 407, evidence of subsequent remedial measures is inadmissible unless it is offered for another purpose, such as impeachment of the witness testifying. As such, when the line of questioning seeks to undermine the witnesses' testimony rather than offer proof of negligence, the questioning is permissible within Evid.R. 407. *Worrell v. Norfolk and Western Railway Co.*, 94 Ohio App.3d 133 (6th Dist.1994).

{¶ 79} During Mudd's testimony, Orren's attorney began a discussion of what the OMUTCD requires in regard to high-intensity lights. The questions and answers discussed the standard set forth in the OMUTCD, as well as options that may have affected the standards imposed. During the questioning, the following exchange occurred regarding the standard of having high-intensity lights.

> Q: That's one of the options for short term work but that option doesn't affect the standard, right, that's just an option. I mean, the standard is still the standard?
>
> A: That standard's never been in effect. My 16 years we've never had that standard enforced.
>
> Q: Four days after this collision Jurgensen required…
>
> * * *

Q: Mr. Mudd, you just said that standard for the high intensity lights on the top was never enforced and my question to you is isn't it true that four days after the Poe's [sic] were killed that Jurgensen did require every truck working on that project to have high intensity lights?

A: Yes.

{¶ 80} In response to Jurgensen's objection, the trial court ruled that the question was meant to impeach Mudd's testimony, rather than offer proof of negligence. We agree. Mudd's response that the standard requiring high-intensity lights had *never* been in effect during his 16 years of employment would include the time period after the accident occurred. The fact that Jurgensen employed the use of high-intensity lights four days after the accident would therefore contradict Mudd's testimony that such lights had never been used. The question may have been inappropriate had Mudd testified that at no time *prior to the accident* had Jurgensen used the lights, but that is not what occurred. Instead, Mudd's emphatic answer that the lights had *never* been used opened the door for Orren's attorney to impeach that testimony with the fact that such lights had been used.

{¶ 81} Jurgensen argues that the impact of the testimony was much more far-reaching than simply impeaching Mudd's testimony because the jury heard evidence that four days after the accident, Jurgensen started using high-intensity lights. However, the trial court offered Jurgensen the option of instructing the jury as to the proper use of Mudd's testimony as impeachment only. However, the record indicates that Jurgensen did not accept the trial court's offer to give an instruction limiting the effect of the testimony to only impeachment. Regardless of whether the limiting instruction was given, however, the trial court properly admitted the testimony for purposes of impeachment, rather than proof of negligence. In light of the circumstances in which the information was developed, we do not find that the trial court abused its discretion in allowing such impeachment into evidence.

**Hearsay**

{¶ 82} Jurgensen also argues that the trial court permitted prejudicial hearsay statements during the trial in regard to whether the Ohio State Highway Patrol met with Jurgensen and ODOT regarding possible safety concerns.

{¶ 83} Generally, out-of-court statements offered to prove the truth of the matter asserted are inadmissible hearsay. Evid.R. 801(C). According to Evid.R. 801(A), a statement is "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion."

{¶ 84} On direct examination of Daniel Mendal, a transportation engineer employed by ODOT, Orren's attorney began a line of questioning related to meetings held between Jurgensen, ODOT, and the Ohio State Highway Patrol. During Mendal's testimony regarding the alleged meetings, the following exchange occurred, with Jurgensen objecting to several of the questions and the trial court overruling the objections.

[Q] But at some point, at the beginning of the project there would be meetings with law enforcement officers to try to coordinate the traffic control, correct?

[A] Right.

[Q] And then there would be meetings with law enforcement officers actually throughout the project correct?

* * *

[Q] So in the meetings in the month before this collision, let's say in September, do you remember and you don't have to remember the specific details of each meeting, I understand it was four years ago, but were there meetings about concerns of dump trucks leaving the median from a near stop and going into the fast lane of I-75?

[A] I'm sure there were, I mean I can't specifically say the dat. [sic]

* * *

[Q] And in those meetings were there ever suggestions from law enforcement officers as far as putting in acceleration lanes or

- 29 -

particular points of entrance and exit to help reduce traffic collisions?

* * *

[A] I have to say I don't know.

[Q] If there's meeting notes from September 10th and September 11th, meeting with yourself and Jurgensen that talk about Sergeant Arnold making suggestions of particular points of entrance and exit or acceleration lanes to help minimize the traffic accidents—

* * *

[A] If we would have had those meetings, and I'm sure we did, you know, [the Ohio State Highway Patrol], when they would come to me obviously they would throw out their suggestions or recommendation, but we would have used our expert which our traffic engineers in conjunction with the contract, ask where the best location would be or is and what you're allowed to do by contract. So I'm sure that would have been discussed at a meeting such as that.

* * *

[Q] There were some discussions about safety regarding the work on the median and the dump trucks entering with Jurgensen present before the Poe collision, correct?

* * *

[A] I mean that stuff sounds familiar but like I said it was four years ago. I mean I'd have to go through all the notes and look at that and I'm sure I'd be able to give you a more definite answer.

{¶ 85} The trial court struck Mendal's last answer as speculative, but permitted the other answers regarding the meetings having occurred. Jurgensen argues that these questions permitted hearsay statements to be admitted through Mendal's testimony. However, we disagree. Within the exchange that occurred, there were no out-of-court statements testified to, such as an assertion of what the Highway Patrol or ODOT said during the meetings. At no time did Mendal relay a statement that was made during the meetings,

or make any indication as to what concerns the Highway Patrol or ODOT actually had.

{¶ 86} Even if this court were to assume that the testimony allowed the jury to make an inference amounting to hearsay that the Highway Patrol voiced safety concerns that Jurgensen failed to address, none of Mendal's testimony indicated what those concerns were or in what manner Jurgensen responded to the concerns. We find no prejudice within the testimony because Mendal never indicated that the Highway Patrol was dissatisfied with the safety protocol enacted by Jurgensen or that any negative comments were made during the meetings about the steps taken by Jurgensen to make the slow moving dump truck situation safer. Moreover, Mendal indicated several times throughout his answers that he did not recall what was said during the meetings, or could not remember in any detail what assertions were made at the meetings. The record does not indicate in any manner what weight, if any, the jury gave these noncommittal answers that contained no significant probative value.

{¶ 87} At most, Mendal's testimony confirmed that meetings occurred regarding traffic control and safety measures taken by Jurgensen specific to the highway widening project. This information was not new to the jury, as previous witness testimony addressed the fact that such meetings occurred. Without any out-of-court statements to complain of, and without demonstrating that even the possible inferences were prejudicial, the trial court did not abuse its discretion in permitting the testimony.

**Cumulative Error**

{¶ 88} Jurgensen argues that the trial court's ruling on the negligence per se issue, and the trial court's admission of alleged hearsay and testimony regarding subsequent remedial measures resulted in an unfair trial. Despite Jurgensen's invitation for this court to engage in a civil cumulative error analysis, we need not do so, as none of the challenges Jurgensen raised were error.

{¶ 89} After reviewing the record, we find that the trial court properly found negligence per se, admitted limited questions about subsequent remedial measures, and permitted testimony about meetings that occurred between ODOT, Jurgensen, and the Highway Patrol. As such, Jurgensen's fourth assignment of error is overruled.

{¶ 90} Judgment affirmed.

RINGLAND, P.J., and HENDRICKSON, J., concur.