WOODS et al., Appellants,

v.

CITY OF BEAVERCREEK, Appellee.

[Cite as *Woods v. Beavercreek* (1989), 62 Ohio App.3d 468.]

Court of Appeals of Ohio,
Greene County.

No. 88–CA–38.

Decided April 11, 1989.

*Terry L. Lewis,* for appellants.

*Miller, Finney & Clark* and *Jerome G. Menz; Rudd, Silverberg & Zaharieff* and *Anthony Zaharieff,* for appellee.

WOLFF, Presiding Judge.

Appellants, David Woods ("Woods"), and Jesse Woolum ("Woolum"), appeal from a judgment granting a directed verdict in favor of appellee, city of Beavercreek ("Beavercreek" or "appellee"). Appellants' cases, originally filed as separate actions, were consolidated for trial by agreement of counsel. (See Motion to Consolidate dated July 25, 1986.)

On June 12, 1984, after 10:00 p.m., Woolum was operating his motorcycle southbound on Wine Coup Court, Beavercreek, with Woods as his passenger. The two suffered various personal injuries when Woolum drove the motorcycle into a guardrail located at the end of Wine Coup Court. Woolum and Woods were thrown over the guardrail and into a chain-link fence just beyond.

Woolum and Woods were attempting to reach a convenience store located on Grange Hall Road. Wine Coup Court and Grange Hall Road are bisected by State Route 675. However, Woolum had not driven along Grange Hall Road for "3 or 4 years," and was unaware that Wine Coup Court was a dead-end street culminating in a metal guardrail and fence.

The motorcycle was travelling along Wine Coup Court at a speed between twenty-five and thirty-five miles per hour, and its low-beam headlight was turned on. Witnesses D.C. and Randall Eldridge, who had lived on Wine Coup Court since 1980, observed the motorcycle drive directly into the guardrail without skidding or attempting to stop. D.C. Eldridge stated that from where he sat in his yard, one hundred fifty feet from the guardrail, he could see the guardrail if he'd been looking for it. Woolum observed the guardrail from a distance of twenty to twenty-five feet away but stated that "the guardrail appeared like it was on a curve, you just didn't expect it to be a dead end." (Plaintiffs' Exhibits 1 and 2.) In addition, Woolum observed "headlights and taillights, like there was traffic further up on the road we were travelling." When Woolum approached the guardrail, he was "too close to it to stop." Woods observed the guardrail from a distance of fifteen feet away, but stated that there was no time to warn Woolum prior to impact.

Witnesses D.C. and Randall Eldridge testified that Wine Coup Court was not illuminated by street lights. At the intersection of Wine Coup Court and Germany Trebein Road, the point at which Woolum turned onto Wine Coup Court, there were no signs bearing a "no outlet" warning. Behind the metal guardrail, which was not reflectorized, were posted three diamond-shaped signs painted a dully non-reflective red color (Plaintiffs' Exhibits 1, 2 and 13).

Following the presentation of his witnesses, counsel for appellants offered into evidence the Ohio Manual of Uniform Traffic Control Devices (1972)

("Manual"). However, the trial court refused to admit it on the grounds that the Manual was not a proper subject for judicial notice.

At the close of appellants' evidence, Beavercreek moved for a directed verdict upon the following grounds: (1) appellants offered no evidence of any violation of Manual signage regulations; (2) assuming, *arguendo,* that Beavercreek did violate Manual signage requirements and such violation constituted negligence, such negligence was not the proximate cause of appellants' damages; (3) as to Woolum, his negligence in failing to maintain an assured clear distance ahead negates any negligence of Beavercreek; (4) as to Woods, the negligence of Woolum was a superseding intervening proximate cause of his injuries, and Woods assumed the risk of mishap by voluntarily riding the motorcycle. The record discloses the decision of the trial court, "construing the evidence most strongly in the Plaintiffs' favor that the evidence is insufficient to establish a breach of duty by the Defendant to proximately cause the Plaintiffs' injuries." The judgment entry of April 25, 1988 journalizes the grant of a directed verdict in favor of Beavercreek without specifying the grounds therefor. It is from this judgment that appellants now appeal.

Appellants' first and second assignments of error may be combined as follows: the trial court improperly granted a directed verdict in favor of appellee where appellee was negligent as a matter of law and created a hazard. Appellants' third assignment of error states that the grant of a directed verdict was an abuse of discretion even if some evidence of comparative, contributory or superseding negligence existed.

Civ.R. 50(A)(4) governs the grant of a directed verdict upon the evidence and states:

"When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

The facts on record, in conjunction with several Manual sections discussed *infra,* dictate that Beavercreek was negligent *per se.* The record also discloses that reasonable minds could come to differing conclusions regarding the proximate cause of the injuries sustained by appellants. As to these issues, a directed verdict was improper. Therefore, we reverse and remand this case for trial in accordance with this opinion.

R.C. 4511.09 sets forth the legislative mandate for the promulgation of uniform specifications for traffic control devices in Ohio by the Department of

Transportation. These specifications are contained in the Manual. R.C. 4511.11 defines the duty of local authorities to act in conformity with Manual specifications: "(A) Local authorities * * * shall place and maintain traffic control devices in accordance with the department of transportation manual and specifications * * *." It is not disputed that Wine Coup Court is a roadway within the local jurisdiction of Beavercreek. Therefore, Beavercreek is required to obey the pertinent Manual specifications as they relate to Wine Coup Court.

It is clear that the Manual comprises a section of Ohio law regarding traffic control devices. As set forth in *State, ex rel. Ohio Motorists Assn., v. Masten* (1982), 8 Ohio App.3d 123, 127, 8 OBR 179, 183, 456 N.E.2d 567, 571–572:

"The Supreme Court recently defined the term 'general laws' as follows:

"' * * * A statute which sets forth police, sanitary and similar regulations uniformly statewide is a general law for purposes of Section 3, Article XVIII of the Ohio Constitution.' *Eastlake v. Bd. of Bldg. Stds.* (1981), 66 Ohio St.2d 363, 368 [20 O.O.3d 327, 330, 422 N.E.2d 598, 601].

"R.C. 4511.11(A) is manifestly intended to create a statewide, uniform regulation of traffic control devices."

See, also, *Tiley v. Baltimore & Ohio RR. Co.* (Oct. 20, 1988), Miami App. No. 88–CA–7, unreported, 1988 WL 110314, stating at 10: "The Manual is to be accorded the force of law." In light of this holding, the trial court erred in failing to take judicial notice of the Manual pursuant to Civ.R. 44.1(A)(1).

In *Masten, supra,* the court considered the issue of whether "the Linndale Village Council [was] subject to a writ of mandamus, ordering it to conform the unlawfully positioned 'Stop Here on Red' sign and stop line to statewide specifications." (*Masten, supra,* 8 Ohio App.3d at 125, 8 OBR at 181, 456 N.E.2d at 569.) The court held in the affirmative, relying, as do we, upon Manual specifications.

The appellants contend that Beavercreek was negligent because there was no "no outlet" sign at the intersection of Wine Coup Court and Germany Trebein Road, and because the barricade at the closed end of Wine Coup Court was not in conformity with the Manual.

We reject appellants' contention as to the "no outlet" sign but agree with appellants' contention as to the barricade.

Manual Section 2N–20 sets forth specifications for a "No Outlet Sign" as follows:

"This sign is intended for use to warn the motorist of the cul-de-sac, or public street or road permanently closed at one end.

"The sign *shall* be erected on the right side just beyond the last intersection with another street or road and shall face traffic entering the street or road with 'NO OUTLET'." (Emphasis added.)

■ By its terms, the primary purpose of the Ohio Manual of Uniform Traffic Control Devices is standardization of design and application:

"1C ENGINEERING STUDY REQUIRED

"The decision to use a particular device at a particular location should be made on the basis of an engineering study of the location. Thus, while this Manual provides standards for design and application of traffic control devices, the Manual is not a substitute for engineering judgment. *Except for sections of this Manual that mandate the installation of a traffic control device*, it is the intent that the provisions of this Manual be standards for traffic control device installation, but not a requirement for installation. Qualified engineers are needed to exercise the engineering judgment inherent in the selection of traffic control devices, just as they are needed to locate and design the roads and streets which the devices complement. * * * "

■ Bearing this primary purpose in mind, we do not read Section 2N–20 as requiring Beavercreek to install a "no outlet" sign. Instead, we read the "shalls" as merely referring to the placement of the sign and the language on the sign, should Beavercreek determine that such a sign is necessary.

Sections 2N–43 and 3B–33, which were the focus of *Tiley v. Baltimore & Ohio RR. Co.* (Oct. 20, 1988), Miami App. No. 88–CA–7, unreported, 1988 WL 110314, unlike Section 2N–20, do, respectively, expressly mandate the installation of railroad advance warning signs and placement of railroad advance warning pavement markings.

■ Manual Section 2N–20 also states: "One or more Object Markers (X–4) *may* be erected at the closed terminal of the street or road, at a minimum height of 4 feet. * * * " (Emphasis added.) It is true that this specification is permissive rather than mandatory. Yet once the decision is made to place a traffic control device at a given location, the device must comply with Manual specifications. See *Pierce v. Ohio Dept. of Transp.* (1985), 23 Ohio App.3d 124, 23 OBR 235, 491 N.E.2d 729.

■ The record indicates that at the closed end of Wine Coup Court were a metal guardrail and three diamond-shaped signs painted a flat red color. These devices are not in conformity with Manual Sections 4C–3 and 4C–10.

Manual Section 4C–3(d) states: "The End of Roadway Marker X–4 shall be a diamond-shaped red panel with nine 3–inch red reflectors or an 18" reflective red panel * * *."

The installation of barricades, like the installation of the "End of Roadway Marker," is permissive rather than mandatory pursuant to Manual Section 4C–10. However, the metal guardrail did not meet the specifications set forth in 4C–10. That section, referring to Section 7F–2, mandates that a barricade must be from eight to twelve inches wide, at least four feet long, and at least five feet high with red and white reflectorized stripes.

■ Beavercreek's assertion that it did not install the barricade is without legal significance. R.C. 4511.11(A) provides:

"*Local authorities* in their respective jurisdictions *shall place and maintain traffic control devices* in accordance with the department of transportation manual and specifications for a uniform system of traffic control devices, adopted under section 4511.09 of the Revised Code upon highways under their jurisdiction as are necessary to indicate and to carry out sections 4511.01 to 4511.76 and 4511.99 of the Revised Code, local traffic ordinances, or to regulate, warn, or guide traffic." (Emphasis added.)

Section 2A–3 of the Manual provides in part:

"Traffic signs shall be placed *only* by the Ohio Department of Transportation or *by the local authority* having jurisdiction over regulating, warning, or guiding traffic. No traffic sign or its support shall bear any commercial advertising." (Emphasis added.)

It is clear that Beavercreek cannot delegate its responsibility for erecting traffic control devices in conformity with the Manual.

Because the object marker and barricade did not meet Manual specifications, we hold that Beavercreek was negligent as a matter of law. See *Eisenhuth v. Moneyhon* (1954), 161 Ohio St. 367, 53 O.O. 274, 119 N.E.2d 440.

However, the liability of Beavercreek cannot be decided until the issue of proximate cause is determined by a jury.

■ Appellee contends that Woolum's negligent breach of R.C. 4511.21(A), assured clear distance ahead, is a superseding intervening cause of both his own and Woods' injuries, which outweighs any negligence by Beavercreek and cuts off appellants' right of recovery.

In *Paulin v. John R. Jurgensen Co.* (1982), 7 Ohio App.3d 273, 274, 7 OBR 354, 355–356, 455 N.E.2d 524, 526, the court set forth the following four requirements necessary to a determination of a violation of the assured clear distance ahead statute:

"(i) the object was ahead of the putative tortfeasor in his line of travel; (ii) it was either stationary or proceeding in the same direction; (iii) it did not suddenly appear in the driver's path; and (iv) it was reasonably discernible to

the driver." Citing *Blair v. Goff–Kirby Co.* (1976), 49 Ohio St.2d 5, 3 O.O.3d 4, 358 N.E.2d 634.

In *Paulin,* as in the instant case, the fourth requirement regarding discernibility was at issue. We find the following passage from *Blair,* cited by the *Paulin* court, to be germane:

" '[T]he discernibility of an object, regardless of its size, should be a jury question where the evidence of discernibility is sufficient to make reasonable persons disagree is supported by policy reasons and the holdings of other jurisdictions as well. To begin with, the goals of the tort system are probably better served by a jury determination of the facts than by judge-made determinations of law.

" 'Especially in cases involving the assured-clear-distance statute, which, by definition, require evaluation of the conduct of the driver in light of the facts surrounding the collision, the judgment of a jury is more likely to achieve a fair result than is a judge-made rule of law.' " *Id.,* 7 Ohio App.3d at 275, 7 OBR at 356, 455 N.E.2d 526.

See, also, *McFadden v. Elmer C. Brewer Transp. Co.* (1952), 156 Ohio St. 430, 46 O.O. 354, 103 N.E.2d 385 (wherein the court held that in order to prove violation of the assured-clear-distance-ahead statute, defendant must present substantial evidence of the discernibility of an object).

The facts reveal that Woolum observed the guardrail from fifteen feet away, that Woods observed it from twenty feet away, and that D.C. Eldridge could see it from one hundred fifty feet away if he'd been looking for it. Additionally, there was no "no outlet" sign posted and the barricade and signs at the closed end of the road were not in conformity with Manual specifications. We find that reasonable minds could reach differing conclusions regarding the discernibility of the obstacle in Woolum's path.

In accordance with this opinion, the judgment of the trial court will be reversed and remanded.

*Judgment accordingly.*

FAIN, J., concurs.

BROGAN, J., concurs separately.

BROGAN, Judge, concurring.

I concur in the opinion of my colleagues. I would, however, reverse the trial court's grant of the directed verdict for the additional reason I believe the city was required to erect the no outlet sign in order to comply with the

requirements of the Manual of Uniform Traffic Control Devices. (See Section 2n–20.)

I believe Section 1(C) of the Manual mandates the installation of traffic control devices provided in the Manual except where "engineering judgment" is inherent in the selection of the traffic control device. See, also, *Winwood v. Dayton* (1988), 37 Ohio St.3d 282, 525 N.E.2d 808. I believe Section 2N–20 reflects the Department of Transportation's view that motorists must be warned that a public street or road is closed at one end and it has provided for the mandatory installation of a no outlet sign. The use of the term *"shall"* reflects the department's view that no engineering judgment is involved in the decision to erect the sign. See *Tiley v. Baltimore & Ohio RR. Co., supra.* In all other respects, I agree with the majority opinion.