[Cite as *Oliphant v. AWP, Inc.*, 2020-Ohio-229.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| JOSEPH OLIPHANT AND<br>ANITA OLIPHANT, | : | |
| | : | CASE NO. CA2019-02-036 |
| Appellants, | : | |
| | : | O P I N I O N<br>1/27/2020 |
| - vs - | : | |
| | : | |
| AWP, INC., | : | |
| Appellee. | : | |

CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CV2016-04-0958

Rendigs, Fry, Kiely & Dennis, LLP, John F. McLaughlin, Peter L. Ney, 600 Vine Street, Suite 2650, Cincinnati, Ohio 45202, for appellants

Reminger Co., LPA, Vincent P. Antaki, 525 Vine Street, Suite 1700, Cincinnati, Ohio 45202, for appellee

Cooke Demers, LLC, Adam J. Bennett, Andrew P. Cooke, 260 Market Street, Suite F, New Albany, Ohio 43054, for Ohio Bureau of Workers' Compensation

**HENDRICKSON, P.J.**

{¶ 1} Appellants, Joseph Oliphant and Anita Oliphant, appeal the decision of the

Butler County Court of Common Pleas granting summary judgment to appellee, AWP, Inc.,

on the Oliphants' respective claims for negligence and loss of consortium. For the reasons

discussed below, we affirm the judgment of the trial court.

{¶ 2} The present case arises out of an accident that occurred within a utility work zone located near the intersection of Cox Road and Liberty Way in West Chester, Butler County, Ohio on April 22, 2015. Duke Energy had contracted with Bowlin Energy, a utility company, to install new electrical poles and power lines for a development project around the area (the "Cox Road Project"). Duke Energy had contracted with AWP to provide temporary traffic control services for the Cox Road Project. AWP was responsible for creating and maintaining a work zone on Cox Road and for providing traffic control near the work zone.

{¶ 3} Cox Road runs north and south. It has two northbound lanes and two southbound lanes, which are separated by a flat median. There is also a bicycle lane that runs south on Cox Road next to the curb. On April 22, 2015, Bowlin was installing support wires on Cox Road near the intersection with Liberty Way. The support wires were to run from newly installed poles on the west side of Cox Road to newly installed poles on the east side of Cox Road. To allow Bowlin to install the wires, AWP created a lane-closure in the lane closest to the bicycle path that abutted the curb in the southbound lane of Cox Road. This allowed traffic to continue to travel southbound on Cox Road in the lane closest to the median while creating a work zone for Bowlin employees. One of Bowlin's utility trucks sat partly in the bicycle lane and partly in the closed southbound lane. Once Bowlin was ready to run the newly installed wires from the west side of Cox Road to the poles on the east side of Cox Road, AWP employees, with the aid of a West Chester police officer, would briefly stop all lanes of traffic on Cox Road.

{¶ 4} Tiffanie McCants and Amber Rooks, traffic control specialists employed by AWP, set up and maintained the work zone on Cox Road on April 22, 2015. After speaking with Bowlin employees about the work to be completed that day, McCants and Rook laid out traffic cones and caution signs the required distance from one another. McCants and Rook

used an arrow board on the back of an AWP truck to let motorists know the southbound curbside lane was closed and motorists had to travel southbound in the open lane that abutted the median. McCants and Rook directed Officer Jeffrey Newman to park his patrol car at the north end of the Liberty Way intersection to block entrance into the closed lane.

{¶ 5} Multiple Bowlin employees worked inside the work zone created by McCants and Rooks, including Billy Moore, Bowlin's foreman, Blake Patton, who operated the bucket of Bowlin's utility truck, and J. Oliphant, a member of the ground crew. While Bowlin employees worked within the work zone, McCants and Rook stood at opposite ends of the work zone, monitoring traffic and ensuring that pedestrians and bicyclists did not enter the work zone. They held paddles that said "SLOW" on one side and "STOP" on the other. McCants and Rooks also patrolled the work zone, making sure no cones had fallen, that the signs remained visible, and warning lights were functioning correctly.

{¶ 6} Bowlin's work required Bowlin to communicate with AWP so that AWP could adjust the work zone when necessary. When Bowlin was ready to hang utility wires from the west side to the east side of Cox Road, necessitating the closure of all lanes of traffic, Bowlin's foreman would call a "huddle" or meeting with Bowlin and AWP workers to discuss the next steps. Moore explained that such a huddle was typical or common in utility work as it was necessary to ensure that everyone was on the same page when it came to stopping traffic.

{¶ 7} Shortly after 3:00 p.m. on April 22, 2015, Moore signaled McCants and Rooks to meet. McCants and Rooks huddled with Moore and J. Oliphant in the curbside lane of southbound Cox Road by the side of the Bowlin utility truck to discuss closing all lanes of traffic. Moore explained that the location of a huddle depends upon the particular worksite. Moore made a judgment call to have the huddle by the side of the Bowlin truck facing the closed southbound lane because, in his opinion, it was the "best place" for the huddle due to

the strong wind that was blowing that day. Moore and J. Oliphant were located closest to the truck, with McCants and Rooks flanking them and standing further in the closed lane of traffic. Patton, who was in the bucket of the utility truck, also participated in the meeting.

{¶ 8} Just as the huddle broke, a vehicle driven by Michelle Shuster, who was under the influence of Xanax and marijuana, entered the work zone and struck Bowlin's utility truck, J. Oliphant, Moore, McCants, and Rooks. Schuster's car had come from a northbound lane of traffic, crossed over the median and open southbound lane of traffic, and entered the closed southbound lane where Bowlin's and AWP's workers were standing. Shuster, traveling at 50 m.p.h., struck the workers without hitting her vehicle's brakes. No screeching tires or honking horns warned the workers of Schuster's out-of-control vehicle.

{¶ 9} Rooks, J. Oliphant, Moore, and McCants were transported to a hospital by ambulance. Rooks died from the injuries she sustained from the accident. J. Oliphant sustained serious brain and orthopedic injuries, rendering him permanently disabled. Moore and McCants also sustained serious orthopedic injuries.

{¶ 10} Following the accident, Schuster was convicted of aggravated vehicular homicide, negligent homicide, three counts of aggravated vehicular assault, and operating a motor vehicle while impaired. In April 2016, the Oliphants filed suit against Schuster and Kevin Bowman, the individual believed to have supplied Schuster with marijuana and Xanax, in Butler County Court of Common Pleas Case No. CV2016-04-0958. The Oliphants asserted claims of negligence and loss of consortium against Schuster and Bowman, and further contended that Bowman and Schuster had been engaged in a joint enterprise at the time Schuster struck J. Oliphant, thereby making Bowman vicariously liable for Schuster's actions. The Ohio Bureau of Worker's Compensation ("OBWC") was also named as a party to the suit, as OBWC had a subrogation interest in the action due to paying medical bills, expenses, or benefits to J. Oliphant.

{¶ 11} In July 2016, Rooks' estate filed a wrongful death action against Bowman and Schuster in Butler County Court of Common Pleas Case No. CV2016-07-1582. The case was consolidated with the Oliphants' suit in Case No. CV2016-04-0958. Subsequently, in September 2016, Bowman filed for bankruptcy and the cases were stayed. Bowman was discharged from bankruptcy on March 2, 2017. Shortly thereafter, on April 18, 2017, the Oliphants filed suit against AWP in Butler County Court of Common Pleas Case No. CV2017-04-0864, asserting claims for negligence and loss of consortium. Specifically, the Oliphants alleged that AWP had been hired and had "assumed a duty of care to create, implement, and execute a traffic safety and control plan to protect the safety of Bowlin employees within the Work Zone, including Joseph Oliphant," AWP had breached its duty of care, and as a direct and proximate cause of its breach of duties, J. Oliphant suffered severe permanent injuries. This suit was consolidated with the Oliphants' suit against Bowman and Schuster.

{¶ 12} Following the filing of the foregoing lawsuits, the parties engaged in discovery. Multiple depositions were taken, including the depositions of Bowman, Officer Newman, Patton, Moore, J. Oliphant, A. Oliphant, McCants, Eric Hulme, the director of safety at AWP, and Jerry G. Pigman, a professional engineer and traffic control expert.

{¶ 13} During their respective depositions, Patton, Moore, and McCants all testified about the huddle that took place immediately prior to the accident. All agreed that it was "normal" or "common" to have a huddle that included both utility workers and traffic control workers. Regarding the location of the meeting, all agreed that Moore called the huddle and selected the side of the Bowlin truck facing the closed southbound lane as the place for the huddle. Although Moore believed this was the "best place" for the huddle, Patton noted that "normally they stay at the ends of the work zones, not just like right in the middle" of the work zone. However, Patton "didn't really think about [the location] too much." Moore admitted that if it had not been so windy on April 22, 2015, the huddle would have likely occurred

- 5 -

behind the truck at its rear corner as "we just always work off the back of the truck. It just comes natural."

{¶ 14} McCants testified that when she and Rooks joined Moore and J. Oliphant near the utility truck during the huddle, she and Rooks, who were flanking Moore and J. Oliphant, stood closer to the open southbound lane because she and Rooks "were protecting" Moore and J. Oliphant. She stated, "We were trying to make sure that they had the most protection they could have. Even if it meant using ourselves as crash dummies." Although McCants acknowledged that flanking Moore and J. Oliphant in an effort to use their bodies to protect Moore and J. Oliphant was not part of the training she received from AWP, she stated she and Rooks nonetheless stood that way because they recognized that the Bowlin workers were "not safe" as they were standing in an area exposed to traffic traveling north and south on Cox Road.

{¶ 15} When deposed, McCants, Moore, and Patton all stated that they never saw Schuster's vehicle cross from the northbound lane, over the median and open southbound lane, and into the work zone before hitting them.[1] All agreed that every worker in the work zone had a duty to watch out for out-of-control vehicles entering the work zone, but no one saw Schuster's vehicle until it struck them. McCants stated, "it was the most outrageous thing [she had] ever seen in [her] life" and there was no time to react or warn the others of Schuster's vehicle before they were all struck. Moore agreed that neither Rooks or McCants had time to warn anyone of Schuster's out-of-control vehicle as it was "just a wild accident."

{¶ 16} Patton, however, felt that the workers on the ground – both utility and traffic control workers – should have had time to react to Schuster's out-of-control vehicle. He noted that while his back was turned to the northbound traffic as he was moving the bucket of

---

1. Due to the injuries he sustained, J. Oliphant has experienced problems with his memory and was unable to recall the events that occurred around the time of the accident.

Bowlin's truck upwards, no one else's back should have been turned away from traffic. Patton testified that while the accident could not have been prevented, he believed it may have been possible for someone on the ground to have warned or signaled about the out-of-control vehicle. He stated,

> There's a – there's freak accidents and then there's controllable variables. And the line between those aren't – isn't always clear-cut, but could somebody have [time to react to the out-of-control vehicle]? Yes and no. * * *
>
> * * *
>
> Prevented [the accident], no. I don't think anybody could have stopped the car coming. Warned, signaled, I mean that's technically an undetermined variable. But when somebody's job is to maintain that variable or maintain the route to get out of those variables or to avoid those variables, I think it can become and be viewed differently.

{¶ 17} The expert retained by the Oliphants provided a written opinion that AWP had failed to perform traffic services within the work zone at Cox Road in a manner that conformed to generally accepted standards of care in the industry. After examining the traffic crash report from the accident, the West Chester Police Department's case summary report, photographs of the accident, discovery responses from AWP and Duke Energy, deposition testimony from those present at the scene of the accident, and the crash data retrieval report from Schuster's vehicle, Pigman determined that the distance of travel from the northbound interior lane of Cox Road, where Schuster's vehicle approached from, to the area of impact in the work zone was approximately 350 to 400 feet. As Schuster's vehicle was traveling 50 m.p.h. during the five seconds prior to impact with no breaking during the eight seconds prior to impact, Pigman determined that workers in the work zone would have had 4.8 to 5.4 seconds to observe the approaching vehicle and take some form of action to avoid being impacted by the vehicle. Pigman's report opined that

Ms. McCants and Ms. Rooks, as AWP employees responsible for traffic control at the work site, should have had sufficient time and opportunity to observe the approaching out-of-control vehicle and issue a warning to others in the work area. The Chevrolet Cavalier [driven by Schuster] was less than 6 feet wide and therefore with advance warning, minor movement by the work crew away from the approach path could have likely been accomplished in the time available.

{¶ 18} Pigman noted that McCants and Rooks "were not actively flagging at the time of collision" but instead were meeting with Bowlin employees adjacent to the utility truck. Pigman explained that the "primary responsibility of personnel providing traffic control is to ensure the work zone is set up in conformance with MUTCD [Manual on Uniform Traffic Control Devices] standards and managed throughout the work activity with maximum attention to the workers within the work zone and traveling public." In spite of this responsibility, McCants and Rooks, by standing in the work zone in front of the Bowlin utility truck during the huddle, were not in Pigman's opinion, "positioned where maximum traffic control and advance warning could have been provided to the Bowlin work crew. * * * Their choice of a location to meet and discuss traffic control and subsequent inattention to approaching traffic did not allow the opportunity to provide maximum safety." In Pigman's expert opinion, "even when not actively flagging or performing other basic traffic control duties, [McCants and Rooks] should have been alert to the potential breach of the work zone and hazard to those performing the work activity."

{¶ 19} Pigman was later deposed and questioned about his written opinion. Pigman clarified that traffic control specialists managing a work zone in a work zone safety operation is different than an active flagging operation near a work zone. Pigman stated that "[i]t was not necessary for flagging activities to be present or ongoing at [the Cox Road] location as it was laid out." However, "AWP, as the traffic control providers, had a responsibility to

maintain a safe working area, not necessarily by being flaggers, but necessarily by being safety providers within the work zone."

{¶ 20} Pigman testified he was critical of the location of the huddle that occurred immediately prior to the accident. Although there is "no industry publication" that specified where such a meeting should take place, Pigman testified that broad safety guidelines with the need for attentiveness to the safety of the work area determine the appropriate location for a meeting. Pigman testified, "if there was a need for a meeting, [workers] should have been convened in a more safe [sic] location than adjacent to a truck, being the bucket truck, with only traffic cones being the separating channeling barrier device." Rather, Pigman testified, the meeting should have occurred "[o]ff the roadway, on a sidewalk or away from the traffic flow, where the likelihood of being between a vehicle and traffic moving would have been eliminated." Furthermore, Pigman testified that if Bowlin had, indeed, been the one to call the meeting at the side of the truck, "AWP, as the traffic control providers, should have insisted that a location, other than where they were standing, be found for that meeting, and involve all the parties there, including the police officer that apparently was in the immediate vicinity, as well as the other Bowlin employee[s]."

{¶ 21} Finally, Hulme, AWP's director of safety, was deposed, and he testified about the difference between a "flagger" and a "traffic control specialist." He explained that the two terms are not synonymous with one another and that "a 'flagger' in the State of Ohio is a legal traffic control device. It is somebody who has an understanding of the regulations, the guidelines associated with that role. A 'traffic control specialist' is a job title at AWP." According to Hulme, McCants and Rooks were not functioning as "flaggers" at the Cox Road Project on April 22, 2015, but rather were providing temporary traffic control services related to a right-hand lane closure.

{¶ 22} Hulme testified that AWP had adopted the training and safety standards of the American Traffic Safety Services Association ("ATSSA"). Rooks, who had been hired on January 13, 2015, and McCants, who had been hired on February 3, 2015, were trained according to ATSSA safety standards. Hulme testified that AWP employees are trained to recognize that out-of-control vehicles, distracted drivers, and impaired drivers are a danger in a work zone. He stated,

> AWP provides its traffic control specialists with knowledge and an expectation that they are to be aware of their surroundings, to know what escape route that those employees will follow if there is – if there is a need to follow an escape route, and wants to be able to ensure that they are aware and have the opportunity to warn workers in the event of a potential issue.

In order to warn workers of out-of-control vehicles, AWP equips its employees with two-way radios that have a "call feature," which emits a loud, audible noise that can be heard from a "great distance" away. McCants and Rooks had been issued the two-way radios on April 22, 2015.

{¶ 23} Regarding the huddle that occurred immediately before the accident, Hulme testified that traffic control specialists have regular communications with utility workers in order to understand what work is being performed, how it is going to be performed, and what controls are needed to make the area the safest for the workers, road users, and traffic control specialists. When asked whether both McCants and Rooks needed to be present in the huddle, Hulme stated there was "potentially" a need for both employees to be present, as it was important that all individuals in the work zone had a clear understanding of what was about to take place so that work could proceed as planned. When questioned about whether McCants or Rooks should have suggested a different location for the huddle, Hulme stated that "AWP hopes that its traffic control employees would work with their customer and understand and choose a location to have their huddles that limits the risks that they are

exposed to." After being pressed on the issue, Hulme stated McCants and Rooks "potentially" should have suggested the huddle occur elsewhere, stating "AWP does see that there are other locations and opportunities for them to meet, rather than where they were standing * * *. But AWP does not have firsthand knowledge as to why they [Bowlin] chose that specific location."

{¶ 24} Following discovery, AWP moved for summary judgment on the Oliphants' negligence and loss of consortium claims, arguing that AWP did not owe a duty to J. Oliphant as Bowlin and AWP were two independent contractors that did not have a contractual relationship with one another, Bowlin was engaged in an inherently dangerous activity (utility construction) and AWP was not an active participant in Bowlin's work, and AWP did not have a "special relationship" with J. Oliphant. Alternatively, even if a duty of reasonable care was owed to Bowlin employees, AWP contended it met this burden in its creation, implementation, and execution of the work zone. AWP further argued that the Oliphants could not demonstrate that J. Oliphant's injuries were caused by any breach of AWP's duty of care. Rather, AWP contended that "the criminal act of * * * Schuster was an intervening and unforeseeable act, which breaks the causal chain." In support of its motion, AWP relied on deposition testimony from Hulme, Moore, Pigman, and McCants as well as an affidavit from Hulme, in which he averred in pertinent part that McCants and Rooks had successfully completed ATSSA safety training.[2]

{¶ 25} The Oliphants filed a memorandum in opposition to AWP's motion for summary judgment, arguing that AWP owed a duty to J. Oliphant as (1) J. Oliphant was an intended beneficiary under AWP's contract with Duke Energy and (2) AWP employees had assumed a

---

2. In his affidavit, Hulme also attempted to introduce evidence of an OSHA investigation that was completed after the accident. The trial court granted the Oliphants' motion to strike evidence and testimony of the OSHA investigation from AWP's motion for summary judgment on January 3, 2019. AWP did not appeal the trial court's decision to strike this evidence.

duty to protect Bowlin utility workers, including J. Oliphant, from the danger of out-of-control vehicles. The Oliphants argued AWP breached these duties by failing to comply with section 6E.07 of the Ohio Manual on Uniform Traffic Control Devices ("OMUTCD"), which sets forth certain standards and recommendations for flagging procedures, by failing to be properly positioned to warn of out-of-control vehicles, and by failing to pay sufficient attention to warn of an out-of-control vehicle. Finally, with respect to the issue of proximate cause, the Oliphants contended that Schuster's criminal act was "not a superseding cause because the risk of an out-of-control vehicle entering the work zone – regardless of what caused the driver of the vehicle to lose control – was a foreseeable risk and one of the risks AWP was hired to control." In support of their arguments, the Oliphants relied on deposition testimony from McCants, Moore, Pigman, and Hulme, as well as an affidavit from A. Oliphant, in which she attempted to explain a statement she made during her deposition. When deposed, A. Oliphant stated she "still believed" Schuster was to blame for J. Oliphant's injuries.[3] In her affidavit, A. Oliphant states, in pertinent part, as follows:

> 2. Prior to the filing of this lawsuit and the information gathered in this lawsuit, I was not aware of AWP's duties and obligations or what had happened at the work site where [J. Oliphant] was injured.
>
> 3. I only knew that Michele Schuster had struck [J. Oliphant] with her vehicle while under the influence of Xanax.

---

3. During A. Oliphant's deposition, which occurred on September 25, 2018, A. Oliphant was asked about who she blamed for the accident and J. Oliphant's injuries as follows:

[COUNSEL FOR AWP]: Before you ever spoke with any attorneys, in your mind, did you think AWP did anything wrong?

[A. OLIPHANT]: No, sir.

[COUNSEL FOR AWP]: Before you spoke with any attorneys, did you believe that Michele Schuster was to blame for all of this?

[A. Oliphant]: Yes.

[COUNSEL FOR AWP]: Do you believe she's still to blame for everything?

[A. Oliphant]: Yes.

- 12 -

4. During my deposition, I was not asked whether I now believed AWP did anything wrong, in light of the information and testimony that has been developed in this case.

5. Based upon the information and testimony that has been developed in this case, I now believe AWP did something wrong. AWP did not do enough to protect [J. Oliphant] from Michele Schuster's out-of-control vehicle. AWP did not keep a look-out for out-of-control vehicles or warn [J. Oliphant] of Schuster's out-of-control vehicle.

6. I believe Michele Schuster is to blame for [J. Oliphant's] injuries. I believe AWP is also to blame for [J. Oliphant's] injuries.

{¶ 26} AWP filed a reply brief in support of its motion for summary judgment and a motion to strike A. Oliphant's affidavit on the basis that the affidavit was a sham and was created solely in an effort to contradict her deposition testimony. After considering the parties' arguments and the evidence attached to their respective memorandums, the trial court granted AWP's motion for summary judgment, finding that AWP did not owe a duty of care to J. Oliphant. In reaching this conclusion, the court found section 6E.07 of OMUTCD was inapplicable as the AWP employees were not engaged in, nor were they required to be engaged in, flagging activities at the time of the accident, there was no privity of contract between Bowlin and AWP as they were independent contractors, AWP had not actively participated in or controlled Bowlin's work, and there was no "special relationship" between the parties that would have made AWP liable for a criminal act of a third party. The court found that its decision to grant summary judgment to AWP rendered AWP's motion to strike A. Oliphant's affidavit moot.

{¶ 27} After summary judgment was granted to AWP, the Oliphants, Rooks' estate, and the OBWC dismissed their respective claims against Bowman and Schuster. The dismissal of these claims rendered the trial court's decision awarding summary judgment in

favor of AWP final and appealable. The Oliphants timely appealed the court's decision, raising the following as their sole assignment of error:

{¶ 28} THE TRIAL COURT ERRED BY GRANTING SUMMARY JUDGMENT IN FAVOR OF AWP, INC.

{¶ 29} The Oliphants argue the trial court erred by granting summary judgment to AWP on the basis that AWP did not owe a duty to J. Oliphant. Specifically, the Oliphants contend that pursuant to contractual obligations, AWP owed a duty to J. Oliphant to perform its services according to the generally accepted standards of care, skill, and diligence in the traffic control industry and that McCants and Rooks had assumed a duty to protect J. Oliphant. They further argue issues of fact exist as to whether AWP breached is duty of care to J. Oliphant and whether J. Oliphant's injuries were proximately caused by this breach.

{¶ 30} An appellate court reviews a trial court's decision on a motion for summary judgment de novo, independently and without deference to the decision of the trial court. *Tankersley v. Ohio Fair Plan Underwriting Assn.*, 12th Dist. Clermont No. CA2018-01-003, 2018-Ohio-4386, ¶ 45. Summary judgment is proper when the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, show that (1) there is no genuine issue as to any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) the evidence submitted can only lead reasonable minds to a conclusion that is adverse to the nonmoving party. Civ.R. 56(C); *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66 (1978).

{¶ 31} The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion and demonstrating the absence of genuine issues of material fact. *Anderson v. Jancoa Janitorial Servs.*, 12th Dist. Butler No. CA2019-01-018, 2019-Ohio-3617, ¶ 23, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). Once this initial burden is met, the nonmoving party "must then rebut the moving party's evidence with

specific facts showing the existence of a genuine triable issue; it may not rest on the mere allegations or denials in its pleadings." *Deutsche Bank Natl. Trust Co. v. Sexton*, 12th Dist. Butler No. CA2009-11-288, 2010-Ohio-4802, ¶ 7, citing Civ.R. 56(E). Summary judgment is proper if the nonmoving party fails to set forth such facts. *Taylor v. Atrium Med. Ctr.*, 12th Dist. Warren No. CA2018-07-074, 2019-Ohio-447, ¶ 10. "In determining whether a genuine issue of material fact exists, the evidence must be construed in favor of the nonmoving party." *Id.*

{¶ 32} To establish a negligence claim, the plaintiff must demonstrate (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached the duty of care, and (3) as a direct and proximate result of the defendant's breach, the plaintiff was injured." *Anderson* at ¶ 24, citing *Forste v. Oakview Constr., Inc.*, 12th Dist. Warren No. CA2009-05-054, 2009-Ohio-5516, ¶ 9. A plaintiff's inability to prove any one of these elements is fatal to his or her claim of negligence. *Capella v. Historic Developers, LLC.*, 12th Dist. Butler No. CA2017-07-109, 2018-Ohio-546, ¶ 58.

{¶ 33} "[W]hether a defendant owes a duty to a plaintiff depends upon the relationship between them." *Hutson v. Konieczny*, 52 Ohio St.3d 214, 217 (1990). The determination of whether a duty exists is question of law for the court to decide. *Mussivand v. David*, 45 Ohio St.3d 314, 318 (1989).

{¶ 34} The Ohio Supreme Court has determined, in a number of negligence cases, the scope of a contractor's liability. As a general rule, the court has held that "[w]here an independent contractor undertakes to do work for another in the very doing of which there are elements of real or potential danger and one of such contractor's employees is injured as an incident to the performance of the work, no liability for such injury ordinarily attaches to the one who engaged the services of the independent contractor." *Wellman v. East Ohio Gas Co.*, 160 Ohio St. 103 (1953), paragraph one of the syllabus. Furthermore, "[a] general

contractor who has not actively participated in the subcontractor's work, does not, merely by virtue of its supervisory capacity, owe a duty of care to employees of the subcontractor who are injured while engaged in inherently dangerous work." *Cafferkey v. Turner Constr. Co.*, 21 Ohio St.3d 110 (1986), syllabus.

{¶ 35} As particularly relevant to the case before us, the supreme court has addressed the duty that exists between two independent contractors working on the same project. The court held that "[a]n independent contractor who lacks a contractual relationship with a second independent contractor owes no affirmative duty beyond that of ordinary care to the employees of the second contractor, where the first contractor does not supervise or actively participate in the second contractor's work." *Kucharski v. Natl. Eng. & Contr. Co.*, 69 Ohio St.3d 430 (1994), syllabus.

{¶ 36} The supreme court has defined "active participation" within the context of a general contractor's involvement in a subcontractor's work, holding that "for purposes of establishing liability to the injured employee of an independent subcontractor, 'actively participated' means that the general contractor directed the activity which resulted in the injury and/or gave or denied permission for the critical acts that led to the employee's injury, rather than merely exercising a general supervisory role." *Bond v. Howard Corp.*, 72 Ohio St.3d 332, 337 (1995). The court further defined "active participation" within the context of a property owner's involvement in a contractor's work, stating that "active participation giving rise to a duty of care may be found to exist where a property owner either directs or exercises control over the work activities of the independent contractor's employees, or where the owner retains or exercises control over a critical variable in the workplace." *Sopkovich v. Ohio Edison Co.*, 81 Ohio St.3d 628, 643 (1998). The supreme court has not, however, defined "active participation" as it relates to the relationship between two independent

contractors engaged in work in an inherently dangerous work environment, such as a utility construction zone.[4]

{¶ 37} This court has previously acknowledged that "[a]pplying the 'active participation' definition stated in *Bond* and *Sopkovich* is often unworkable in situations involving multiple subcontractors since roles among subcontractors are typically not supervisory in nature." *Nibert v. Columbus/Worthington Heating & Air Conditioning*, 12th Dist. Fayette No. CA2009-08-015, 2010-Ohio-1288, ¶ 22. After all, "[s]ubcontractors are usually employed to perform separate tasks, but * * * these tasks often overlap in some manner or involve the same workspace although no supervisory relationship exists." *Id.* Nonetheless, we found that subcontractors in a nonsupervisory position can still be found to "actively participate" in the performance of another subcontractor's work within an inherently dangerous work environment. *See id.* Other courts have agreed and held that "[f]or the purposes of establishing liability to the injured employee of an independent contractor, 'actively participated' means that a fellow independent contractor directed the activity which resulted in the injury and/or gave or denied permission for the critical acts that led to the employee's injury." *Pinkerton v. J.&H Reinforcing & Structural Erectors, Inc.*, 4th Dist. Scioto Nos. 10CA3386 and 10CA3388, 2012-Ohio-1606, ¶ 34. *See also Solanki v. Doug Freshwater Contracting, Inc.*, 7th Dist. Jefferson No. 06-JE-39, 2007-Ohio-6703. However, where an independent contractor is engaged in inherently dangerous work and there is no evidence of

---

4. "Work is inherently dangerous when it creates a peculiar risk of harm to others unless special precautions are taken." *Pusey v. Bator*, 94 Ohio St.3d 275, 279 (2002). "[I]t is not necessary that the work be such that it cannot be done without a risk of harm to others, or even that it be such that it involves a high risk of such harm. It is sufficient that the work involves a risk, recognizable in advance, of physical harm to others, which is inherent in the work itself." *Id.*, citing 2 Restatement of the Law 2d, Torts, Section 427, Comment b (1965). The Supreme Court has recognized that a construction site is an inherently dangerous working environment. *See Michaels v. Ford Motor Co.*, 72 Ohio St.3d 475, 478 (1995), fn. 4. Courts have further determined that construction that occurs on a roadway is also inherently dangerous. *See, e.g., Cowell v. Ohio Dept. of Transp.*, Ct. of Cl. No. 2003-09343-AD, 2004-Ohio-151, ¶ 18 (recognizing that roadway construction "contains many dangers, hazards, and potential for harm not only to workers involved, but to the motoring public"). In the present case, the utility construction that occurred at Cox Road and Liberty Way, which required lane-closures, constituted inherently dangerous work.

active participation by another independent contractor, the duty of ordinary care established by *Kucharski* is eliminated "because [the injured independent contractor] should have been aware of the dangers of his work and protected himself against them." *Solanki* at ¶ 43-44. *See also Pinkerton* at ¶ 25-26. "'[B]ecause the construction site was inherently dangerous, [the first subcontractor's] active participation was necessary to establish a duty of care to the [second subcontractor].' * * * To hold otherwise would mean that '[the first subcontractor would have owed [the second subcontractor] a greater duty of care than an owner, general contractor, or construction manager would have.'" *Ellis v. Time Warner Cable, Inc.*, 1st Dist. Hamilton No. C-120083, 2013-Ohio-240, ¶ 10, quoting *Pinkerton* at ¶ 24 and 26.

{¶ 38} Turning to the facts of the present case, there is no dispute that AWP and Bowlin are independent contractors that were separately retained by Duke Energy for work on the Cox Road Project. AWP was hired to create and maintain a work zone for the Cox Road Project and Bowlin was hired to install new electrical poles and power lines along Cox Road. It is further undisputed that the two independent contractors had to work in tandem with one another to ensure Bowlin was able to complete the utility work for which Duke Energy had contracted. However, after construing the evidence in favor of the Oliphants, we cannot conclude that AWP directed or exercised control over J. Oliphant's work activities. Rather, the deposition testimony and evidence submitted by the parties demonstrates that Bowlin controlled AWP employees to the extent that Bowlin's foreman, Moore, dictated when the work zone and associated traffic control would move from point to point as the utility work progressed on Cox Road. Moore, after determining when road closures needed to occur to string the electrical wires across Cox Road, directed Bowlin employees and AWP employees to meet to discuss the next steps in Bowlin's work. Moore determined when and where the meeting would take place. Moore called a meeting by the side of the Bowlin utility truck facing the closed southbound lane as he believed it was the "best location" given the weather

and work environment. As AWP employees did not direct J. Oliphant or the Bowlin employees to meet at the side of the utility truck or otherwise give or deny permission for the huddle, AWP cannot be said to have actively participated in the critical acts that led to J. Oliphant's injuries.[5]

{¶ 39} As already noted, Bowlin's foreman alone made the decision to call the huddle at the side of the utility truck. AWP personnel were not consulted about this decision. Utility construction, especially that occurring on or near a roadway is known to be dangerous work. Deposed Bowlin employees acknowledged that every worker in a work zone had a duty to watch out for out-of-control vehicles entering the work zone, thereby acknowledging the dangerous nature of their work. Despite this, the Oliphants assert that certain provisions of AWP's contract with Duke energy reveal that AWP retained control over safety procedures at the project site and that Bowlin employees, as workers at the project site, were owed a general duty of protection through AWP's contract with Duke Energy.

{¶ 40} The Ohio Supreme Court considered and rejected a similar argument in *Cafferkey,* 21 Ohio St.3d at 112-113. In *Cafferkey,* two employees of an independent contractor attempted to hold the general contractor liable for injuries the employees sustained while attempting to install caissons deep in the ground, which was inherently dangerous work. *Id.* at 111-112. The employees were severely burned when an explosion of methane gas occurred as the employees were following the directives of their employer, the independent contractor. *Id.* at 111. The employees argued the general contractor was liable for their injuries as "certain provisions of the contract between [the general contractor] and [their employer, the independent contractor,] as well as certain portions of [the general

---

5. We note that the Oliphants have not argued or presented any evidence creating an issue of fact as to whether AWP set up the work zone in a manner that failed to comply with state or federal laws and regulations. In fact, the Oliphant's expert testified that the traffic control devices AWP utilized in creating the work zone, such as traffic cones, caution signs, and the arrow board on the back of AWP's truck, as well as where such devices were placed, met industry standards and requirements.

contractor's] safety manual reveal[ed] [the general contractor's] retention and control over safety procedures at the project site." *Id.* at 113. The supreme court rejected the argument, holding that the general contractor

> had an obvious interest in safety and it insisted that its own employees as well as the employees of subcontractors carry on their work activities in as safe a manner as possible. Nevertheless, this concern for safety, which was evidenced in a variety of ways, does not constitute the kind of active participation in [the independent contractor's] work that is legally required to create a duty of care extending from [the general contractor] to [the independent contractor's] employees.
>
> * * *
>
> The contract language pertaining to job safety is nothing more than standard "boilerplate" terminology common to virtually all construction contracts. [The general contractor] retained the ability to monitor and coordinate the activities of all subcontractors in order to ensure compliance with the architect's specifications. The various contractual rights reserved by [the general contractor] did not empower [the general contractor] to control the means or manner of [the independent contractor's] performance. [The independent contractor] * * * assumed the responsibility to construct and install caissons in a sound, efficient, and safe manner.
>
> The details of [the independent contractor's] performance were directed and carried out solely by [the independent contractor's] employees. [The general contractor] did not direct or interfere with [the independent contractor's] work.

*Id.* at 113.

{¶ 41} Just like in *Cafferkey*, the fact that AWP's contract with Duke Energy set forth certain provisions requiring AWP to utilize and ensure that certain security and safety procedures were followed so as to achieve a safe and injury free work place did not mean that AWP was an active participant in Bowlin's work at the time of the accident. The various contractual rights set forth in AWP's contract with Duke Energy did not give AWP the ability to control Bowlin's performance within the work zone. Accordingly, we do not find that AWP's

- 20 -

contract with Duke Energy, which set forth certain safety standards, created a duty of care that extended to J. Oliphant.

{¶ 42} The Oliphants also argue that AWP owed a duty to J. Oliphant pursuant to Section 6E.07 of the OMUTCD, which sets forth certain procedures for flaggers to follow when engaging in temporary traffic control. "[T]he Ohio Legislature adopted the OMUTCD by promulgating R.C. 4511.09, which required [the Ohio Department of Transportation] to adopt a 'manual for a uniform system of traffic control devices * * *.'" *Orren v. BWF Corp.*, 12th Dist. Warren No. CA2013-11-112, 2015-Ohio-62, ¶ 68. "R.C. 4511.11 further establishes a duty to act in conformity with the OMUTCD's specifications so that the OMUTCD comprises a section of Ohio law regarding traffic control devices." *Id.*, citing *Woods v. Beavercreek*, 62 Ohio App.3d 468 (2d Dist.1989).

{¶ 43} The OMUTCD includes headings that classify and categorize the nature of its accompanying text. As Section 1A.13 of the manual explains, the text of the OMUTCD is grouped under headings labeled "Standard," "Guidance," "Option," and "Support." A "standard" statement is "a statement of required, mandatory, or specifically prohibitive practice regarding a traffic control device. * * * The verb 'shall' is typically used. The verbs 'should' and 'may' are not used in Standard statements. * * * Standard statements shall not be modified or compromised based on engineering judgment or engineering study." OMUTCD, Section 1A.13. A "guidance" statement is "a statement of recommended, but not mandatory, practice in typical situations, with deviations allowed if engineering judgment or engineering study indicates the deviation to be appropriate. * * * The verb 'should' is typically used. The verbs 'shall' and 'may' are not used in Guidance statements." *Id.* An "option" statement is a "statement of practice that is a permissive condition and carries no requirement or recommendation." *Id.* A "support" statement is "an informational statement that does not convey any degree of mandate, recommendation, authorization, prohibition, or

enforceable condition." *Id.* Generally, a duty of care exists only where the standards contained in the state-adopted manual are mandatory or "standard statements." *Davis v. Brown Local School Dist.*, 7th Dist. Columbiana No. 17 CO 0026, 2019-Ohio-246, ¶ 61. *See also Emmerling v. Mahoning Cty. Bd. of Commrs.*, 7th Dist. Mahoning No. 15 MA 0165, 2017-Ohio-9066 (finding that the county did not owe a duty of care to a motorcyclist where the traffic signs at issue were not mandatory under the OMUTCD).

{¶ 44} Section 6E.07 sets forth certain standards for flagging with a paddle or with a flag. Section 6E.07 goes on to provide *"Guidance"* as follows:

> *The flagger should stand either on the shoulder adjacent to the road user being controlled or in the closed lane prior to stopping road users. A flagger should only stand in the lane being used by moving road users after road users have stopped. The flagger should be clearly visible to the first approaching road user at all times. The flagger also should be visible to other road users.* ***The flagger should be stationed sufficiently in advance of the workers to warn them (for example, with audible warning devices such as horns or whistles) of approaching danger by out-of-control vehicles. The flagger should stand alone, away from other workers, work vehicles, or equipment.***

(Italics emphasis sic; bold emphasis added.)

{¶ 45} As noted above, "guidance" statements set forth in the OMUTCD are not mandatory. Rather, such statements supply a recommended practice. As such, a duty of care does not arise out of Section 6E.07's "Guidance" section.

{¶ 46} Moreover, even if we were to find that the "Guidance" statement of Section 6E.07 did create a duty for flaggers, the Oliphants have failed to present any evidence indicating that an active flagging situation was, or should have been, taking place at the time of the accident. The OMUTCD sets forth certain situations in which the use of flaggers or automated flagging assistance devices (AFAD) should be used. *See* OMUTCD Sections 6C.10 thru 6C.15 (discussing the use of flaggers or AFAD for one-lane, two-way traffic

control). However, the Oliphants have not identified any standard in the OMUTCD that requires flaggers to be used when the curbside lane of a multilane road has been closed, but traffic continues to travel in the same direction in the open lane abutting the median of the roadway. The Oliphants' expert specifically testified that there was not an active flagging operation at the time of the accident and that "it was not necessary for flagging activities to be present or ongoing at [the Cox Road] location as it was laid out." As AWP employees were neither required nor engaged in an active flagging operation at the time of the accident, OMUTCD Section 6E.07 is not applicable and does not create a duty of care to J. Oliphant.

{¶ 47} Finally, the Oliphants argue AWP employees assumed a duty of care when they joined the huddle called by Moore and stood in a manner that flanked the Bowlin employees. Specifically, the Oliphants contend that McCants and Rooks "deliberately positioned themselves in a well-intentioned but misguided effort to 'protect'" the Bowlin employees from the risks of an out-of-control vehicle as they stood in the work zone and issues of fact exist as to whether this assumed duty of care was breached. In support of their argument, the Oliphants rely on the 2 Restatement of the Law 2d, Torts, Section 323 (1965).

{¶ 48} Section 323 provides that

> [o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

{¶ 49} "Section 323(a) 'applies only when the defendant's actions increased the risk of harm to the plaintiff relative to the risk that would have existed had the defendant never provided the services initially.'" *Holcomb v. Holcomb*, 12th Dist. Clermont No. CA2013-10-

080, 2014-Ohio-3081, ¶ 24, quoting *Wissel v. Ohio High School Athletic Assn.*, 78 Ohio App.3d 529, 540 (1st Dist.1992). Or, stated another way, "the defendant's negligent performance must somehow put the plaintiff in a worse situation than if the defendant had never begun the performance." *Wissel* at 540. "To prevail, a plaintiff must 'identify sins of commission rather than omission.'" *Holcomb* at ¶ 24, quoting *Wissel* at 540.

{¶ 50} Further, "to impose liability under Section 323(b), * * * the plaintiff [must] 'show actual or affirmative reliance, i.e., reliance based on specific actions or representations which cause the persons to forego other alternatives of protecting themselves.'" *Id.* at ¶ 25, quoting *Power v. Boles*, 110 Ohio App.3d 29, 36 (10th Dist.1996).

{¶ 51} In this case, AWP's employees did not assume a duty to protect J. Oliphant as contemplated by Section 323(a) or (b). There is no evidence that McCants' and Rooks' decision to flank the Bowlin employees in the huddle put J. Oliphant in a worse position than he would have been in had McCants and Rooks chosen to stand elsewhere in the huddle. Regardless of whether McCants' and Rooks' were on the inside or the outside of the huddle, the inherent danger of an out-of-control vehicle entering the work zone remained the same, and all workers – AWP and Bowlin employees alike – were aware of this danger and were responsible for watching out for this threat. Additionally, the Oliphants did not present any evidence suggesting that J. Oliphant specifically relied on McCants' and Rooks' position in the huddle to keep him safe or that McCants' and Rooks' positions caused J. Oliphant to forego some other method of protecting himself. Deposition testimony that Bowlin employees relied, generally, on AWP to create and maintain a safe work zone does not create an issue of fact as to whether J. Oliphant specifically relied on McCants' and Rooks' position in the huddle for his own safety. Consequently, there is no genuine issue of material fact regarding whether AWP assumed a duty to J. Oliphant.

{¶ 52} Accordingly, for the reasons discussed above, we find that AWP did not owe a duty of care to J. Oliphant. As there are no genuine issues of material fact regarding any duty AWP owed to J. Oliphant, any argument as to proximate cause is rendered moot. *See Holcomb*, 2014-Ohio-3081 at ¶ 28. AWP has demonstrated it is entitled to judgment as a matter of law on the Oliphants' negligence and loss of consortium claims. The trial court, therefore, did not err in granting AWP's motion for summary judgment. The Oliphants' sole assignment of error is overruled.

{¶ 53} Judgment affirmed.

S. POWELL, J., concurs.

RINGLAND, J., dissents.

**RINGLAND, J., dissenting.**

{¶ 54} I respectfully dissent from the majority's decision. I would find that when the evidence is looked at in the light most favorable to the Oliphants, the nonmoving parties, genuine issues of material fact remain regarding whether AWP owed a duty of care to J. Oliphant and whether that duty was breached. Therefore, I would find the trial court erred by granting summary judgment to AWP.

{¶ 55} The majority opinion correctly identifies the development of case law in this state regarding the scope of a contractor's liability. As it relates to the scope of liability for general contractors, "[a] general contractor who has not actively participated in the subcontractor's work, does not, merely by virtue of its supervisory capacity, owe a duty of care to employees of the subcontractor who are injured while engaged in inherently dangerous work." *Cafferkey v. Turner Constr. Co.*, 21 Ohio St.3d 110 (1986), syllabus. The supreme court later extended the *Cafferkey* decision to independent contractors, holding "[a]n independent contractor who lacks a contractual relationship with a second independent

- 25 -

contractor owes no affirmative duty beyond that of ordinary care to the employees of the second contractor, where the first contractor does not supervise or actively participate in the second contractor's work." *Kucharski v. Natl. Eng. & Contr. Co.*, 69 Ohio St.3d 430 (1994), syllabus.

{¶ 56} The standard announced in *Kucharski* is applicable to the instant case since it involves two independent contractors with no contractual relationship. *See Nibert v. Columbus/Worthington Heating & Air Conditioning*, 12th Dist. Fayette No. CA2009-08-015, 2010-Ohio-1288, ¶ 22. In *Nibert*, this court reversed a grant of summary judgment in favor of an independent contractor to determine if there was "active participation" in a worksite for purposes of establishing the duty element in a negligence action. *Id.* at ¶ 22. *Nibert*, which is factually similar to the case at bar, specifically addressed the difficulty in analyzing cases involving nonsupervisory contractors:

> Applying the "active participation" definition * * * is often unworkable in situations involving multiple subcontractors since the roles among subcontractors are typically not supervisory in nature. Subcontractors are usually employed to perform separate tasks, but, as here, these tasks often overlap in some manner or involve the same workspace although no supervisory relationship exists. *Surely subcontractors in a nonsupervisory position can also "actively participate" in the performance of another subcontractor's work and, as such, must exercise a duty of ordinary and reasonable care to other subcontractors when executing their job functions in an inherently dangerous work environment. To declare otherwise, would allow all nonsupervisory subcontractors to complete their work without regard for others on the job site.*

*Id.* (Emphasis added).

{¶ 57} Following review, and construing the evidence in favor of the Oliphants, I believe the Oliphants have submitted evidence demonstrating a genuine issue of material fact regarding "active participation" between AWP and Bowlin. Though it is true that Bowlin's foreman decided when and where the "huddle" meeting was to occur, I would not find that

fact to be dispositive in the resolution of this matter. As noted in the majority opinion, AWP was responsible for creating and maintaining the work zone and for providing traffic control. McCants, the AWP traffic control specialist, testified that she and Rooks positioned themselves to protect the huddle and did so because they recognized that the Bowlin workers were "not safe." Despite that recognition, there is no evidence that AWP employees attempted to inform those workers of their concerns or suggest an alternative location for the meeting. As found by the Oliphants' expert, if Bowlin's foreman had been the one to call the location of the meeting, then "AWP, as the traffic control providers, should have insisted that a location, other than where they were standing, be found for that meeting, and involve all the parties there, including the police officer that apparently was in the immediate vicinity, as well as the other Bowlin employee[s]." Additionally, the Oliphants' expert testified that AWP breached its standard of care in several respects by failing to perform traffic services within the work zone in a manner that conformed to generally accepted standards of care in the industry. Since there are disputed issues of fact, a jury should decide the issue of whether AWP is liable to the Oliphants for their respective claims for negligence and loss of consortium. Because the decision to affirm summary judgment does not allow the disputed issues to be resolved by a jury, I must respectfully dissent.